(No. 32520.—

The People *ex rel.* John Gutknecht, State's Attorney, Appellant, *vs.* The City of Chicago *et al.*, Appellees.

*Opinion filed March 23, 1953.*

602

John Gutknecht, State's Attorney, of Chicago, (Gordon B. Nash, Melvin F. Wingersky, Irving Lang, and Albert Zemel, of counsel,) for appellant.

IVAN A. ELLIOTT, Attorney General, of Springfield, and JOHN J. MORTIMER, Corporation Counsel, J. RUSSELL SCOTT, and WILSON & McILVAINE, all of Chicago, (CLAY JUDSON, WILLIAM S. BODMAN, ELSA C. BECK, GEORGE E. HALE, MILTON P. WEBSTER, JR., PETER A. DAMMANN, WILLIAM C. WINES, and ROBERT J. NOLAN, of counsel,) for appellees.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

This case involves the validity of the 1949 amendments to the Blighted Areas Redevelopment Act of 1947. It is here upon appeal from a judgment of the circuit court of Cook County which dismissed, after a trial, a *quo warranto* action brought upon the relation of the State's Attorney of Cook County against the Chicago Land Clearance Commission, the city of Chicago, and the State Housing Board.

As originally enacted, the Blighted Areas Redevelopment Act of 1947 (Ill. Rev. Stat. 1947, chap. 67½, pars. 63 to 91,) was concerned with "slum and blighted areas" which were found to contribute to, and cause the spread of disease, crime, infant mortality and juvenile delinquency, and to necessitate excessive and disproportionate expenditures for crime prevention and punishment, fire and health protection and other public services, which constituted a drain upon public revenues and impaired the efficient functioning of municipalities and the State government. The elimination of these areas and the construction of redevelopment projects financed by private capital was declared to be a public use essential to the public interest.

In broad outline, the 1947 act provided for the establishment of Land Clearance Commissions in municipalities of more than 25,000 upon resolution of the governing body of the municipality, approved by the State Housing Board. It authorized Land Clearance Commissions to investigate the extent and location of slum and blighted areas, and

to designate specific slum or blighted areas as redevelopment projects. To be effective, such a particular designation was required to be approved by the State Housing Board and the governing body of the municipality. The Land Clearance Commission was authorized to acquire title to all real property, within the project area by purchase, gift or condemnation. After acquisition of the land, the Commission was to clear the site and then to sell the land, at its use value, to a purchaser or purchasers whose plans for development of the property had been approved. Such sales were also required to be approved by the State Housing Board and the governing body of the municipality. The act provided that the State Housing Board and the governing bodies of municipalities might make grants of funds to Land Clearance Commissions in aid of redevelopment projects.

A "slum and blighted area" was defined in the 1947 act as "any area * * * where buildings or improvements, by reason of dilapidation, obsolescence, overcrowding, faulty arrangement or design, lack of ventilation, light and sanitary facilities, excessive land coverage, deleterious land use or layout or any combination of these factors, are detrimental to the public safety, health, morals, or welfare." Ill. Rev. Stat. 1947, chap. 67½, par. 65(j).

The Amendatory Act of 1949 amended the title and several sections of the 1947 act. It declared that there existed, in many communities of the State, areas of predominantly open land which are unmarketable for housing or other economic purposes because of "obsolete platting, diversity of ownership, deterioration of structures or site improvements, or taxes and special assessment delinquences [sic] usually exceeding the fair value of the land." (Ill. Rev. Stat. 1949, chap. 67½, par. 64.) It was found by the General Assembly that these unmarketable areas impaired or arrested the sound growth of communities, constituted a blight upon communities by preventing the con-

struction of critically needed residential housing, and promoted the creation of slum and blighted areas as defined in the 1947 act, with their attendant evils of disease, crime, infant mortality and juvenile delinquency. Utilizing the existing mechanisms provided in the 1947 act, the Amendatory Act authorized Land Clearance Commissions to ascertain the existence of such unmarketable areas, acquire them, and sell them for development in accordance with an approved plan. As in the case of the 1947 act, all essential determinations of the Land Clearance Commissions in connection with open undeveloped areas were made subject to approval by the State Housing Board and the governing body of the municipality involved.

It was stipulated that after an investigation and survey, the Chicago Land Clearance Commission, by resolution, made a determination that a so-called blighted vacant area of forty acres of predominantly open platted urban land, bounded by Seventy-seventh Street, Seventy-ninth Street, Rockwell Street and Western Avenue, in Chicago, should be acquired and designated as "Blighted Vacant Area Redevelopment Project No. 2." This determination was approved by the State Housing Board and by the city council of Chicago. Thereafter Normandy Homes, Inc., an Illinois corporation, submitted to the commission a redevolpment plan whereby it was to acquire the tract and construct thereon 160 single-family detached dwelling units, ranging in selling price between $12,000 and $18,000 with most units selling for about $15,000. The Land Clearance Commission approved this redevelopment plan, as did the State Housing Board and the city council. It was also stipulated that the Land Clearance Commission was preparing to expend public funds and to exercise the right of eminent domain to acquire the area for the purpose of selling it to Normandy Homes, Inc., or to some other eligible purchaser under the act, for redevelopment conformably to the redevelopment plan. It was stipulated further that the Federal

Housing Act of 1949 makes Federal financial aid available to local public agencies for urban redevelopment projects of the character here involved, and that the Commission was prepared to apply for a Federal capital grant in connection with this project, having received written assurance from the agency which administers the Federal Housing Act of 1949 that the land included in the project is a site of the character described in section 110(c)(iii) of the Federal Act. The stipulation concludes with the statement that acquisition by the Commission of the land included in Project No. 2 and its development for residential uses pursuant to a plan of redevelopment would provide critically needed housing in Chicago and be of great assistance in the slum clearance program in which the commission is engaged.

Plaintiff does not attack the Blighted Areas Redevelopment Act of 1947, as originally enacted. That act was before this court and its validity was sustained in *People ex rel. Tuohy* v. *City of Chicago,* 399 Ill. 551, and *Chicago Land Clearance Com.* v. *White,* 411 Ill. 310. The present attack is confined to the Amendatory Act of 1949. On that question, we shall consider the seven issues pertaining to the validity of the act which were made by the pleadings and argued on appeal. Alleged violations of constitutional provisions not argued are abandoned.

We consider first the contention that the Amendatory Act violates section 13 of article IV of our constitution in that it transcends the scope of the title of the Blighted Areas Redevelopment Act of 1947. Section 13 of article IV provides that no act shall embrace more than one subject and that shall be expressed in the title. The original act of 1947 dealt only with land which was characterized as slum or blighted primarily because of the physical condition of the structures on it. The Amendatory Act of 1949 amended the title and the body of this act to include vacant land described as blighted because of its unmarketability. There is no objection to such a method of broadening the range

of an existing statute. It has been done hundreds of times. An objection similar to that here raised was presented in *People* v. *City of Chicago,* 256 Ill. 558, where the issue arose because the title of the original act limiting the hours of employment of females specified particular occupations to which the act was applicable. Subsequently, the act was broadened to include new categories of employment and at the same time the title was amended to enumerate both the old and the new categories. To the contention there made that the amendatory act violated section 13 of article IV of the constitution, this court replied, "the method here adopted has been frequently employed, and we cannot see why it does not accomplish the purpose intended by the constitution."

The question in this case must be resolved by considering the content of the amended statute in relation to its amended title. The amended title is as follows: "An Act in relation to the eradication and redevelopment of slum and blighted areas and for the development and redevelopment of blighted vacant areas; to provide for the creation of instrumentalities to aid in the accomplishment of this purpose, and to define the rights, powers and duties of such instrumentalities and of political subdivisions and municipal corporations in connection therewith; and to make provision for financial assistance from the federal government, or any agency or instrumentality thereof, the State of Illinois and municipal corporations therein." The concern of the amended statute with the development and redevelopment of blighted vacant areas is explicitly expressed in the amended title. The only issue which can arise, therefore, is whether the amended act embraces more than a single subject and thus violates section 13 of article IV.

The requirement of singleness of subject has been frequently construed, and the applicable principles are settled. The term "subject" is comprehensive in its scope and may be as broad as the legislature chooses, so long as the matters included have a natural or logical connection. An act may

include all matters germane to its general subject, including the means reasonably necessary or appropriate to the accomplishment of the legislative purpose. Nor is the constitutional provision a limitation on the comprehensiveness of the subject; rather, it prohibits the inclusion of "discordant provisions that by no fair intendment can be considered as having any legitimate relation to each other." (*People ex rel. City of Chicago* v. *Board of County Comrs. of Cook County,* 355 Ill. 245.) To render a provision in the body of a statute void as not embraced in the title, the provision must be one which is incongruous, or which has no proper connection with the title. *Department of Public Works and Buildings* v. *Chicago Title and Trust Co.* 408 Ill. 41.

Applying these principles to the present case, the question is whether the provisions of the amended act are germane to a single subject. The General Assembly found and stated that unmarketable areas like the one here involved are related to the elimination of slums, and expressed the relationship in these words: "(b) that such * * * land constitutes a blight upon communities by preventing the construction of critically needed residential housing; (c) that the retardation of housing and other essential community development and redevelopment projects is a direct and immediate cause of such blighted vacant areas and that the existence of such areas constitutes a menace to the public health, safety, welfare and morals by promoting the creation and continuation of slum and blighted areas, as herein defined, with their attendant evils of disease, crime, infant mortality and juvenile delinquency; * * *." Ill. Rev. State. 1951, chap. 67½, par. 64.

The same interrelation between such stagnant vacant areas and the elimination of slums was recognized by Congress in the Housing Act of 1949. (42 U.S.C.A., sec. 1441 ff.) The report of the Senate committee which recommended the Federal act stated the relationship this way: "It is, of course, perfectly apparent that the elimination of

residential slums in central city areas and their redevelopment in accord with a plan for the most appropriate use of the land therein (*i.e.*, for public use, for industry, for housing at more appropriate density, etc.) makes necessary a dispersion of the families now living in such slums. Federal loan assistance for the acquisition and preparation of open unplatted urban or suburban land to be developed for predominantly housing use, so that adequate provision can be made for the necessary dispersion of some portion of the central city population, is therefore essential to any effective slum clearance operation, and is entirely appropriate." Sen. Rep. 84, par. 2, 81st Congress, 1st Sess.

This court has flatly recognized that the construction of new housing is related to the elimination of slums. The question in *Cremer* v. *Peoria Housing Authority*, 399 Ill. 579, was whether or not the expenditure of public funds for the acquisition of land which would then be sold to a private builder for the erection of housing constituted a public purpose. Answering this question in the affirmative, this court first pointed out that facilitating the supply of additional housing was alone sufficient to constitute a public purpose for the expenditure of State funds. Then, stressing the connection between the supply of additional housing and the elimination of slum areas, the court continued (pp. 589-590) : "The public purpose of the State Grant acts is supplemented to the extent that, although grants are no longer contingent upon the elimination of an equivalent slum area, they promote the development of substantial housing and thus aid in preventing the creation of new blighted areas and permit existing slum areas to be cleared. Slum clearance is, of course, a proper public purpose. (*People ex rel. Tuohy* v. *City of Chicago*, 394 Ill. 477; *Zurn* v. *City of Chicago*, 389 Ill. 114; *Krause* v. *Peoria Housing Authority*, 370 Ill. 356.) With the housing shortage at its peak the practicality or likelihood of any real progress in slum clearance remains remote."

In our opinion, the interrelationships between slum clearance, the revitalization of "dead" areas like that here involved, and the construction of additional housing which have thus been recognized by Congress, the General Assembly and this court, amply justify the legislature in regarding the matters involved in the present statute as germane to a single subject—the elimination of slums.

Plaintiff also asserts that the Amendatory Act is invalid because of certain specific defects. It is argued that the constitution is violated because the title fails to show that "fair value" is made a criterion in ascertaining the lands which the Commission is authorized to acquire. The phrase "fair value" appears in the Amendatory Act in relation to tax and special assessment delinquencies, as one of the criteria to be taken into account in determining whether or not the area in question "substantially impairs or arrests the sound growth of the community." The constitutional provision does not, of course, require the title of a statute to contain all the detailed provisions of an act or to serve as an index to its contents. (*Michaels* v. *Barrett,* 355 Ill. 175.) Inclusion of the words "fair value" in the title of the Amendatory Act was not required.

Plaintiff also complains that the body of the new statute authorizes the use of the proceeds of city of Chicago bonds, approved by referendum prior to the enactment of the Amendatory Act, for new and additional purposes first stated in the Amendatory Act, and that the title fails to show this authorization. This contention is not well taken. Both the original title and the title as amended contain these words: "An Act * * * to make provision for financial assistance from * * * the State of Illinois and municipal corporations therein."

Plaintiff finally asserts that the title of the Amendatory Act fails to show that the statute provides for the acquisition of vacant lands by the Land Clearance Commission, an authority not vested in the Commission by the original

act of 1947. The title of the amendatory bill, however, clearly stated its purpose to amend the title of the original act, and the title as amended specifically refers to vacant lands. As we have pointed out, this method of amendment is not objectionable if the amended title is sufficiently comprehensive and if the content of the original and the amendatory statute are germane to a single subject.

Next to be considered is plaintiff's contention that the acquisition of vacant land areas of the type here involved by a public agency, for subsequent sale to private interests for development for residential use, is not acquisition for a public use or a public purpose, and that therefore eminent domain may not be employed and public funds may not be expended. This court has recognized the existence of an acute housing shortage, (*Cremer* v. *Peoria Housing Authority*, 399 Ill. 579,) and the evidence in this case confirms the continued existence of that shortage. We have held that the expenditure of public funds for the acquisition of land by a public agency to be sold to a private developer for the construction of non-low-rent housing constitutes a public purpose. (*Cremer* v. *Peoria Housing Authority*, 399 Ill. 579.) In *Zurn* v. *City of Chicago*, 389 Ill. 114, we held that the elimination and redevelopment of slum and blighted areas is a public purpose and a public use regardless of the subsequent sale or lease of the property to private interests after redevelopment had been accomplished. And even more recently, in *Chicago Land Clearance Com.* v. *White*, 411 Ill. 310, we held that a condemnation proceeding under the Blighted Areas Redevelopment Act of 1947 was not a proceeding to acquire land for private purposes merely because a Land Clearance Commission had entered into a contract with a private corporation for the sale of the area after it was acquired. (*Chicago Land Clearance Com* v. *White*, 411 Ill. 310.) The method employed by the present statute, acquisition of the land by a governmental agency and its subsequent sale or lease to

private interests, cannot be distinguished from the method which these decisions have sustained. If a distinction is to be drawn between the cases cited and the present case, it must turn upon the type of land which is authorized to be acquired under the present act.

So far as we are aware, this is the first case in which governmental efforts to deal with unmarketable areas of vacant land have received judicial consideration. It is important, therefore, to analyze precisely the matter with which we are dealing. We do not have here the case of an owner of land who desires, for investment purposes, or for other reasons satisfactory to himself, to preserve its character as vacant land. What is involved here is, by the definition of the statute, an area which, because of characteristics of scattered ownership, undesirable platting, deteriorated site improvements, or excessive tax delinquencies, has in fact become unmarketable and because of its unmarketability has distorted the normal development of the community.

The deleterious effect of such areas has been recognized by the Congress which has provided for Federal assistance in eliminating "land which is predominately open and which because of obsolete platting, diversity of ownership, deterioration of structures or site improvements, or otherwise substantially impairs or arrests the sound growth of the community * * *." (42 U.S.C.A., par. 1460.) In the statute here involved, and in another statute known as the Blighted Vacant Areas Development Act of 1949, (Ill. Rev. Stat. 1949, chap. 67½, pars. 91.1-91.7,) the General Assembly of Illinois has recognized that such vacant areas in their present condition are incapable of development for housing purposes by private enterprise. They are characterized as economic, social and physical waste lands, the elimination and development of which is declared to be a public use. The city council, the State Housing Board and the Land Clearance Commission of the city of Chicago have

all recognized the distortion of normal community growth caused by these areas. The testimony in this case supports those conclusions.

It will not do to assert that only the tangible physical characteristics of land may constitute an appropriate subject of legislative concern. It is true that with the exception of deteriorated site improvements such as streets, sewers, water mains, and the like, the impairments dealt with by the legislature in the present statute are not of a tangible character. But that does not make them less real, and if their effect is to render land unmarketable and thereby to force an abnormal pattern of residential growth, no valid reason suggests itself why the legislature may not intervene or why it may not use to describe those areas such shorthand terms as it sees fit. For the legislature to define such areas as "blighted" is unquestionably within the legislative competence. Cf. *Concrete Materials Corp.* v. *Gordon,* 395 Ill. 203.

Upon a determination by the Commission, the State Housing Board, and the municipal governing body that an area satisfies the statutory standards, the Commission will acquire the land from its owner after payment of just compensation pursuant to a voluntary conveyance or after condemnation proceedings. (Section 14.) It will then sell the property at its use value to a purchaser whose plan for development has been approved by it, by the State Housing Board and, in Chicago, by the city council. The Commission cannot acquire property by eminent domain until approval of a plan for its development for predominantly residential use by the Commission, the State Housing Board, and the city council.

Upon the authority of the *Cremer, Zurn,* and *White cases,* we hold that the Amendatory Act does not violate section 13 of article II of the constitution. The purpose and use to which the vacant blighted property is to be taken is both a public purpose and a public use, since the

taking tends to alleviate a housing shortage, is an essential aid and adjunct to slum clearance, removes hazards to health, safety, welfare and morals of the community by developing the area, and eliminates factors impairing and arresting sound community growth.

Attacking the Amendatory Act as an unlawful delegation of legislative power to the Commission, plaintiff contends that discretionary power is vested in the Commission without adequate standards because the terms "predominantly open," "obsolete platting," "diversity of ownership," and "fair value," used in subsection (1) of section 3 of the statute are not defined. What the Commission is to determine under the statute is whether or not the particular vacant area under consideration substantially impairs or arrests the sound growth of the community. Such a finding is required to be based upon subsidiary findings that the area has become unmarketable because platting is obsolete, site improvements have deteriorated, ownership is diversified, or tax delinquencies equal or exceed the fair value of the land.

The Federal Housing Act of 1949 (42 U.S.C.A., par. 1460,) which provides for the making of loans or grants by the Administrator of the Housing and Home Finance Agency to local public agencies to enable them to make land in project areas available for redevelopment, defines a project in part as follows: "(iii) land which is predominantly open and which because of obsolete platting, diversity of ownership, deterioration of structures or of site improvement, or otherwise substantially impairs or arrests the sound growth of the community * * *." It will be noted that this language is almost identical with that of section 3(1) of the Amendatory Act and contains three of the four expressions to which plaintiff so strenuously objects.

The testimony of numerous witnesses in this case shows that the four challenged terms have a recognized meaning to persons familiar with the basic problem which Congress,

the General Assembly, and the city council have all recognized as a matter of serious public concern. Use of words which are commonly understood, when taken in connection with the context, does not render a statute invalid. (*People ex rel. Kerner,* v. *Huls,* 355 Ill. 412.) A statute satisfies the requirement of certainty if the words and phrases employed have a technical or other special meaning sufficiently well known to enable those within their reach to apply them. *Hygrade Provision Co.* v. *Sherman,* 266 U.S. 497; *Omaechevarria* v. *Idaho,* 246 U.S. 343; *People* v. *Mueller,* 352 Ill. 124; *Amberson* v. *Amberson,* 349 Ill. 249; *Kowalczyk* v. *Swift & Co.* 329 Ill. 308.

The words "fair value" are singled out as particularly obnoxious. These words are used in direct connection with taxes and special assessment delinquencies. The word "value" and the term "fair value" are, of course, susceptible of varied meanings. The proper meaning of the word "value" must be ascertained in the light of the purpose of valuation. (*Lucas* v. *Alexander,* 279 U.S. 573, 579.) When construed in its present context the phrase carries an accepted meaning, namely, fair market value, determined by a consideration of all relevant factors except the amount of tax and special assessment delinquencies, with which that value is to be a comparison. It may be observed, in passing, that the phrase "fair cash value" has long been used in our statutes. (See: Revenue Act of 1939, Ill. Rev. Stat. 1951, chap. 120, secs. 20(1), 51, 54, pars. 501, 532, 535.) And "fair value" has long been employed in our corporation laws incident to the rights of dissenting shareholders to a merger or consolidation. Ill. Rev. Stat. 1951, chap. 32, par. 157.70.

The Amendatory Act does not confer unfettered discretion upon the Commission; but rather it empowers the Commission to find facts and to pursue the course of action prescribed. Administrative discretion does not amount to an unconstitutional delegation of legislative power where

adequate standards are afforded by the statute to guide the exercise of the discretion conferred. (*Department of Public Works and Buildings* v. *Lanter*, 413 Ill. 581; *Krause* v. *Peoria Housing Authority*, 370 Ill. 356.

We are of the opinion that the words and expressions isolated and dissected by plaintiff are not so lacking in precision as to make the statute invalid as an improper delegation of legislative power.

Plaintiff contends that deprivation of property without due process is implicit in the following portion of section 27 of the Amendatory Act: "but the provisions of this Act shall be deemed exclusive, in respect to the proceedings herein authorized, and no proceedings, actions or notices shall be required for the doing, or as a condition precedent for the doing, of any of the things herein authorized, except such as are prescribed by this Act." (Ill. Rev. Stat. 1949, chap. 67½, par. 89.) The complaint appears to be that in the first instance, in comparing the "fair value" of land under consideration with accumulated tax delinquencies, the Commission ascertains "fair value" without notice or hearing to owners or other interested persons. But, as the act makes clear, "fair value" is relevant only in appraising the extent of tax and special assessment delinquencies, in the course of determining the causes of the unmarketability of an area under consideration. The decision of a condemning body to acquire property by eminent domain is not a taking of the property, and no question of due process is presented. The taking can, of course, only be accomplished by the filing of a petition and the ascertainment and payment of compensation for the property. (*Chicago, Burlington and Quincy Railroad Co.* v. *Cavanaugh*, 278 Ill. 609, 617.) A complete answer to plaintiff's contention is found in *Zurn* v. *City of Chicago*, 389 Ill. 114, 133, where this court, in rejecting a like contention, said: "The court, in any condemnation suit instituted by a redevelopment corporation, will determine whether these con-

ditions precedent to the exercise of the right have been complied with. The hearing, therefore, in the suit in which it is sought to acquire property by eminent domain, gives to the property owner the right and the opportunity to be heard upon all questions on which he is entitled to a hearing and fulfills all the requirements of due process of law."

Plaintiff contends further that the statute violates separate section 2 of the constitution in that it authorizes the Commission to give financial assistance, make donations, or loan its credit, to a private corporation. The constitutional provision relied upon states: "No county, city, town, township or other municipality, shall ever become subscriber to the capital stock of any railroad or private corporation, or make donation to or loan its credit in aid of such corporation." Plaintiff's assumption of a donation to Normandy Homes, Inc., the prospective developer here, is erroneous. Section 19 does permit the Commission to sell land in a project to a developer at "use value." This term is defined as "the value at which the Commission determines such land should be made available in order that it may be developed or redeveloped for the purposes specified in the plan presented." Sections 3(l) and 14 provide that the land for blighted vacant area redevelopment projects must be developed for predominantly residential uses. The "use value" will thus be the value of the land, subject to restrictions placed upon it by the statute and the redevelopment plan. In this there is no donation of land to a private corporation, nor is there any loan of credit. The constitutional prohibition is not a bar to a municipality entering into a transaction where there is an exchange of considerations between the parties. (*Cremer* v. *Peoria Housing Authority,* 399 Ill. 579, and cases there cited.) Before the Commission may sell vacant land in a redevelopment project it must receive written undertakings from the developer. Section 5 of the State Grant Act of 1947 assailed in the *Cremer case* contained an identical provision concerning the undertak-

ings required of a purchaser before a sale of land. There, it was pointed out that the developer "suffered a legal detriment in agreeing to the construction program and the State received a benefit in that the public welfare will be served by the consequent partial reduction in the housing shortage." The fact that the developer in the *Cremer case* was a nonprofit corporation does not aid plaintiff. The statute there involved provided that real property acquired by local authorities might be sold or leased "to any other individual, association or corporation desiring to engage in a development or redevelopment project," and the court expressly declined to rest its decision on the not-for-profit character of the particular developer there involved. (399 Ill. at 594.) Here, as in the *Cremer case,* there was an exchange of values and considerations between the parties. This being so, separate section 2 does not apply.

Plaintiff also urges that the Amendatory Act authorizes the Commission to become indebted in violation of section 12 of article IX of the constitution. Section 26.1, a new section added by the Amendatory Act, (Ill. Rev. Stat. 1949, chap. 67½, par. 88a,) provides that the Commission may borrow money or property and accept contributions and financial assistance from the United States, the Housing and Home Finance Agency, or any other Federal agency. The Commission is authorized to issue debentures or other evidences of indebtedness to the United States, or any agency thereof, in order to obtain loans for or in aid of any of the purposes of the act. These evidences of indebtedness, however, are to be payable solely out of proceeds from the sale of real property by the Commission pursuant to sections 17, 18 and 19, out of any revenue from the operation and management, or demolition, of existing houses or other improvements located on property acquired by the Commission, or out of capital grants received by the Commission from the United States or some Federal agency. Section 26.1 then provides that there shall

be no personal liability on the part of any member of a Land Clearance Commission or any person executing the evidences of indebtedness and that such evidences of indebtedness shall not be a debt of any city, village, incorporated town, county, the State, or any political subdivision thereof, and that they shall so state on their face. It is further provided that the evidences of indebtedness or obligations shall not be payable out of any funds or properties of a Land Clearance Commission other than from the sources specifically enumerated. Section 26.1 concludes, "Such obligations shall not constitute an indebtedness within the meaning of any constitutional or statutory debt limitation or restriction."

Plaintiff contends that section 26.1 violates section 12 of article IX because it fails to provide for a direct annual tax sufficient to pay the interest on such debt as it falls due, and fails to require payment of the principal within twenty years from the time of contracting the debt. Although, as plaintiff insists, the obligations encompassed by section 26.1 must be paid by the Commission, they are payable solely out of the sources particularly described. While the concluding provision of section 26.1 that the obligations incurred shall not constitute an indebtedness within the meaning of any constitutional or statutory debt limitation is not conclusive, the debts described do not fall within the constitutional inhibition. To a similar contention in *People* v. *Chicago Transit Authority*, 392 Ill. 77, this court answered, "To constitute a debt against a municipality there must be an obligation which the municipality must, if need be, meet with its funds or property. But if the obligation is to be paid solely from the income derived from the property purchased with the bonds or their proceeds, no indebtedness is incurred." *Krause* v. *Peoria Housing Authority*, 370 Ill. 356, is to the same effect.

Upon the authority of *People* v. *Chicago Transit Authority*, 392 Ill. 77, and *Krause* v. *Peoria Housing Authority*,

370 Ill. 356, 370, and the cases there cited, we hold that the contention that section 26.1 violates section 12 of article IX of our constitution is without merit.

The remaining objection relates to the authorization of the use of the proceeds of bonds issued by the city of Chicago under the 1947 act to accomplish the objectives of the amended act. Section 24 of the 1947 act (Ill. Rev. Stat. 1947, chap. 67½, par. 86,) authorized the issuance of bonds by cities "in aid of the eradication and elimination of slum and blighted areas." Pursuant to this authority a referendum was had in the city of Chicago on November 4, 1947, at which a favorable vote was cast upon the proposition whether bonds should "be issued by the City of Chicago to aid in the eradication and elimination of slum and blighted areas within the City of Chicago, as defined and authorized by the Blighted Areas Redevelopment Act of 1947." The Amendatory Act added the following clause to section 24: "Any municipality which has issued bonds pursuant to this section may by ordinance authorize the use of the bond proceeds, or any portion thereof, by a land clearance commission for the additional objectives and powers authorized by this amendatory Act." (Ill. Rev. Stat. 1949, chap. 67½, par. 86.) It is argued that this provision is an illegal authorization to divert the proceeds of a bond issue previously authorized by a referendum vote.

The contention that there is a diversion from the original purpose rests upon a myopic reading of the issue submitted to referendum which centers upon the reference to the "Blighted Areas Redevelopment Act of 1947," and disregards the basic purpose for which the bonds were issued —"to aid in the eradication and elimination of slum and blighted areas within the City of Chicago." As we have pointed out, the General Assembly of Illinois and the Congress of the United States have found that the development of areas such as the one here involved for housing purposes is directly related to the "elimination and eradication of

slums," and this court has recognized that additional housing is an essential part of a slum clearance program. Witnesses of national standing in the field of housing and slum clearance went even further, and testified upon the trial of this case that the construction of housing upon vacant land of the type here involved is indispensable to an effective slum clearance program in the city of Chicago. In the face of such a record we cannot say that the incidental reference to the 1947 act in the statement of the issue submitted upon the referendum, operated to limit the permissible use of the proceeds of the bond issue so that the basic purpose of their issuance is obstructed.

But even if we were to regard the purpose of the Amendatory Act of 1949 as less closely integrated with the original act, there is another and compelling reason why there is here no illegal diversion of public funds. Such a diversion occurs when funds which the legislature has authorized for one purpose are diverted by a municipality to another. Here, however, the General Assembly has itself authorized the use of the funds for the questioned purpose. And in view of the broad powers of the legislature over municipalities and their funds, there is, in such an authorization, no illegal diversion. Repeated decisions of this court have emphasized that "Counties, cities, school districts and other municipal corporations created by authority of the legislature derive all their rights and powers from the source of their creation, * * *." (*People ex rel. Raymond Community High School Dist.* v. *Bartlett,* 304 Ill. 283.) Over the years, the doctrine of legislative supremacy over the territorial limits, the property, and the funds of municipal corporations has been frequently applied. (*County of Richland* v. *County of Lawrence,* 12 Ill. 1; *People ex rel. City of Springfield* v. *Power,* 25 Ill. 169.) In *People ex rel. Taylor* v. *Camargo Community Consolidated School Dist.* 313 Ill. 321, the court, speaking of "public municipal corporations," said, p. 324: "The character of the functions

of such municipal corporations, the extent and duration of their powers and the territory in which they shall be exercised rest entirely in the legislative discretion. The governmental powers which they may exercise and the property which they may hold and use for governmental purposes are equally within the power of the legislature. Their powers may be enlarged, diminished, modified or revoked, their acts set aside or confirmed, at the pleasure of the legislature. The State may, with or without the consent of the inhabitants or against their protest, and with or without notice or hearing, take their property without compensation and vest it in other agencies or hold it itself, expand or contract the territorial area, divide it, unite the whole or part of it with another municipality, apportion the common property and the common burdens in accordance with the legislative will, and it may abolish the municipality altogether. The property of such corporations is public property in the hands of State agents for certain purposes and is subject to the will of the legislature. It has been held so in many cases." Our decisions in *People v. Deatherage,* 401 Ill. 25; *Kocsis v. Chicago Park Dist.* 362 Ill. 24, and *Town of Cicero v. City of Chicago,* 182 Ill. 301, to cite only a few of many, rest upon this principle. It is clear from these decisions that the General Assembly did not lack authority to enact the amendment to section 24 which is here challenged.

Plaintiff seems to contend that the provision which authorizes the broadened use of the bond funds violates section 34 of article IV of the constitution. That section authorizes the General Assembly to provide a scheme or charter of local municipal government for the city of Chicago. In the long sentence in section 34 which authorizes the consolidation of local governments in the city of Chicago, there is a parenthetical clause which states, "(but no new bonded indebtedness, other than for refunding purposes, shall be incurred until the proposition therefor shall

be consented to by a majority of the legal voters of said city voting on the question at any election, general, municipal or special.)" This provision becomes operative only in the event that the legislature provides a consolidated government for the city of Chicago. It has not done so. Section 34 of article IV has no bearing whatsoever upon the present statute, which is a general one applicable to all counties and to all municipalities within the State having a population exceeding 25,000 inhabitants. (Ill. Rev. Stat. 1949, chap. 67½, par. 66.) As shortly stated by this court in *People ex rel. Toman* v. *William Davies Co.* 375 Ill. 397, 401, "Manifestly, the General Assembly may enact legislation affecting the city of Chicago other than by statutes based upon section 34 of article 4." Bonds issued without referendum have been sustained against an objection based upon section 34 of article IV. (*People ex rel. McDonough* v. *Chicago, Milwaukee, St. Paul and Pacific Railroad Co.* 354 Ill. 630.) The proper scope of section 34 of article IV has frequently been pointed out, (*People* v. *William Davies Co.* 375 Ill. 397; *People ex rel. Lindheimer* v. *Gaylord Building Corp.* 369 Ill. 371,) and need not be restated here.

The Amendatory Act, in permitting the use of the proceeds of the bonds sold in 1947, does not violate section 34 of article IV of the constitution, and is not otherwise illegal.

The judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*

Mr. Chief Justice Crampton, dissenting:

Despite a reluctance to express disagreement with a majority of the court, I am compelled in this case to indicate my dissent and to set forth my reasons for so doing.

In my opinion the acquisition of vacant land, and its development for residential uses unrestricted to low-rent accommodations, is not sufficiently related to the subject of slum clearance to satisfy our constitutional requirement

that no act shall embrace more than one subject. A majority of the court bases its conclusion to the contrary upon the rule that an act may include "the means reasonably necessary or appropriate to the accomplishment of the legislative purpose" (in this case the protection of public health and safety by eradicating slum and blighted areas.) The basic question, therefore, is whether the construction of residences unlimited to low-rent housing will substantially contribute to the removal of slums.

In answering this question it is not sufficient to say that increasing the number of residences will alleviate the housing shortage. It is common knowledge that slums and their attendant evils existed long prior to the housing shortage, and that a plentiful supply of houses, or a furtherance of "community growth," does not prevent their spread. To be sure, a supply of houses available at a price range of $12,000 to $18,000, as in the case at bar, will solve the problem for persons who can afford them; and, in so far as the result is not simply to provide more living space per person within that class, some benefits may filter down to persons of low income by making available accommodations formerly occupied by others. But this indirect and tenuous effect upon opportunities for residents of slum areas is not the type of relationship contemplated by the provision in question. No two subjects are so wide apart that they may not be brought into a common focus, if the point of view be carried back far enough. But if realities are recognized it will be seen that slum clearance on the one hand, and a general housing development on the other, are matters which constitute distinct and separate subjects. The evils of slums—the disease and crime ordinarily associated with congested, unsanitary living quarters—are not, of course, among the characteristics of vacant land. And except for appropriate redevelopment of sites formerly occupied by the cleared slums, a matter not involved here, the construction elsewhere of residences beyond the means of the per-

sons displaced can have no appreciable effect in alleviating those evils.

No cases have been found involving the precise question presented herein. However, in cases where slum clearance and housing provisions have been upheld even though combined in a single statute, courts have been careful to point out that the housing accommodations to be erected (elsewhere than on the slum area to be redeveloped) shall be "for persons of the prescribed restrictive incomes;" and that the purpose is to eliminate unsafe, inadequate dwellings and to substitute in their stead decent habitations "for persons heretofore compelled to live under slum conditions." (See, *e.g.*, *Thomas* v. *Housing and Redevelopment Authority*, 234 Minn. 221, 48 N.W. 2d 175; *Dorman* v. *Philadelphia Housing Authority*, 331 Pa. 209, 200 Atl. 834.) In the latter case the Pennsylvania Supreme Court (Schaffer and Drew, JJ., dissenting) observed: "As a necessary concomitant of slum elimination, therefore, provision is made in the Housing Authorities Law for the erection (without profit, and through the enjoyment of federal subsidies, of low-cost housing projects in which to shelter the evicted inhabitants of slum areas. True, it cannot be definitely proved that those who live in the tenements to be demolished will be those who, in whole or in part, will occupy the new dwellings, but the legislation is evidently planned to accomplish that result, and whether the object will be attained or not is a matter for the judgment and responsibility of the legislature." In the case at bar, on the other hand, the statute is manifestly not planned to accomplish such a result, for the residences contemplated for the vacant land to be taken are not such as will be within the financial resources of persons displaced by the slum clearance. Certainly, persons whose means are insufficient to enable them to rent dwellings outside of slum districts can hardly be expected to afford houses of the type involved in this case. The acquisition of vacant land for general resi-

dential development is clearly not a means adapted to the elimination of the crime and health problems created by slum and blighted areas. It is a substantive undertaking or object in itself, involving other and different considerations. The two matters have no proper legislative relation to each other and are not parts of the same legislative scheme. They may not, in my opinion, be joined in the same act.

I must also express my disagreement with the concluson of the court that the Amendatory Act may properly authorize use of the bond proceeds for "the additional objectives" provided by the amendment. The question presented to the voters was specific. It apprised them that the proposed bonds were to be issued "to aid in the eradication and elimination of slum and blighted areas." To the ordinary person asked to vote upon the proposition, the phrase "slum and blighted areas" refers to unsightly places where people are living under undesirable conditions; where disease, crime and juvenile delinquency may be expected to originate; where fire and health hazards normally are found to exist. It would not commonly be understood to mean vacant land having none of such objectionable features, but merely being subject to ownership diversity or tax delinquency. It seems clear that the Amendatory Act—under which the entire proceeds of the bonds may conceivably be used for the purchase and development of vacant land at the expense of actual slum clearance—introduces a new and different use, a use for residences not even restricted to low-rent accommodations where some indirect effect upon the slum areas might be hoped for. Indeed, by section 24 itself the legislature has recognized that the purposes embodied in the amendments are "additional" ones and not merely aspects of the original purpose. If the proposed use of the bond proceeds is within the scope of the original act and an essential part of its program, as suggested in the majority opinion, there would seem to have been little necessity for an amendment at all.

A conclusion that there is a diversion from the original purpose does not depend upon any "myopic reading" of the question submitted to the voters. On the contrary, it is based upon the rule that words are presumably used and understood according to their ordinary usage. There is nothing in the record to suggest that the phrase "slum and blighted areas" had any other than its usual meaning to the voters who approved the bond issue. It is no answer to plaintiff's contention to say that the development of vacant areas for housing purposes is "related to" the elimination of slums. The referendum did not refer to all purposes "related to" the one specified, nor does relationship result in identity either of function or of name.

When the governing body of a municipality is authorized by a vote of the people, and only thereby, to incur a debt for a particular purpose, such purpose must be strictly complied with. Funds so raised cannot with justice be diverted to some other purpose. The rule that the State may abolish a municipality and control the disposition of its property and funds does not constitute a *carte blanche* for designating the uses to which the proceeds of bonds issued pursuant to a referendum may be devoted. Such an application could completely frustrate the will of the people directly concerned, and would seriously impair the principles of right and justice by which our laws should always be tested. There is no adequate reason why the purpose for which bonds are to be issued should not be specifically stated on the ballots. When, as here, it is so stated, any use of the proceeds for additional purposes is a wrongful diversion and should be unequivocally condemned by the courts. In my estimation the majority conclusion condones a deception of the voters, denies them their right of choice, and sets a dangerous precedent for vague, ambiguous interpretations of the uses for which future bond issues may be employed.