(No. 45143.—

THE PEOPLE *ex rel.* CITY OF SALEM, Petitioner, v. CHARLES L. McMACKIN, II, Mayor, Respondent.)

*Opinion filed December 1, 1972.*

SCHAEFER, J., dissenting.

ALFRED S. PFAFF, of the firm of MILLER & PFAFF, City Attorney, of Salem (BORGE AND PITT, GEORGE PITT, and CHARLES P. CARLSON, of counsel), for petitioner.

ROBERT D. ALBRIGHT, of Salem, for respondent.

MR. JUSTICE DAVIS delivered the opinion of the court:

This is an original *mandamus* action, filed pursuant to leave of court (Ill. Const. (1970), art. VI, sec. 4(a); Ill.Rev.Stat. 1971, ch. 110A, par. 381), to compel the respondent, as mayor of the City of Salem, to sign certain bonds and a lease authorized under the provisions of the Industrial Project Revenue Bond Act (hereinafter called "Act"). (Ill.Rev.Stat. 1971, ch. 24, pars. 11–74–1 through 11–74–13.) The constitutionality of the Act is challenged in this proceeding.

The Act is designed to attract industrial developments to Illinois communities. It provides a means or method whereby funds may be raised to carry out the powers

vested in them by the Act. Its declared purpose is "to relieve conditions of unemployment, to aid in the rehabilitation of returning veterans, and to encourage the increase of industry within this State, thereby reducing the evils attendant upon unemployment." Par. 11—74—3.

Section 11—74—4 of the Act grants to municipalities the following additional powers:

"(1) To construct, acquire by gift or purchase, reconstruct, improve, better or extend any industrial project within or without the municipality or partially within or partially without the municipality, but in no event further than 10 miles from the territorial boundaries of such municipality, and to acquire by gift or purchase lands or rights in land in connection therewith.

(2) To issue its bonds to finance in whole or in part the cost of the acquisition, purchase, construction, reconstruction, improvement, betterment or extension of any industrial project. The governing body of the municipality in determining such cost may include all cost and estimated cost of the issuance of such bonds, all engineering, inspection, fiscal and legal expenses, and interest which it is estimated will accrue during the construction period and for 6 months thereafter on money borrowed or which it is estimated will be borrowed pursuant to this Division 74.

(3) To rent or lease such industrial project to industrial concerns in such manner that rents to be charged for the use of the industrial project shall be fixed and revised from time to time so as to produce income and revenues sufficient to provide for the prompt payment of interest upon all bonds issued under this Division 74, and to create a sinking fund to pay the principal of such bonds when due, and to provide for the operation and maintenance of such industrial project and for an adequate depreciation account in connection therewith.

(4) To pledge to the punctual payment of bonds authorized under this Division 74 and interest thereon the income and revenues to be received from such industrial project (including improvements, betterments or extensions thereto thereafter constructed or acquired) sufficient to pay such bonds and interest as they become due and to create and maintain reasonable reserves therefor.

(5) To mortgage such industrial project in favor of the holder or holders of bonds issued therefor.

(6) To sell and convey such industrial project, including without limitation the sale and conveyance thereof subject to a mortgage as provided in this Division 74, for such price and at such time as the governing body of the municipality may determine. However, no sale or conveyance of such industrial project shall ever be made in such manner as to impair the rights or interests of the holder or holders of any bonds issued for the construction, purchase, improvement or extension of any such industrial project.

(7) To issue its bonds to refund in whole or in part, bonds theretofore issued by such municipality under authority of this Division 74.

Property acquired by any municipality pursuant to the provisions of this Division 74 shall be exempt from the imposition and collection of taxes thereon while owned by the municipality, but the use of such property is subject to taxation to be paid by the lessee or occupant as provided in section 26 of the Revenue Act of 1939, filed May 17, 1939, as now or hereafter amended."

The implementation of a project under the Act and the authorization of the necessary bonds to fund the project require only the majority vote of the corporate authorities then in office. The bonds may bear interest not to exceed 7% and may mature up to 40 years after date. (Par. 11—74—5.) However, the bonds may not issue unless approved by the affirmative vote of three fifths of the corporate authorities. Par. 11—74—6.

The covenants which may be contained in any bonds are set forth in the Act. The payments due under the bonds may be secured by a mortgage on the industrial project. (Par. 11—74—7.) The bonds are a lien upon the rentals from the industrial project. Par. 11—74—9.

As to the absence of any obligation upon the part of any municipality to pay the monies due on the bonds, section 11—74—10 of the Act provides:

"No holder of any bonds issued under this Division 74 has the right to compel any exercise of taxing power of the municipality to pay the bonds or the interest

thereon, and the bonds do not constitute an indebtedness of the municipality or a loan of credit thereof within the meaning of any constitutional or statutory provision. It shall be plainly stated on the face of each bond that it has been issued under the provisions of this Division 74 and that it does not constitute an indebtedness of the municipality or a loan of credit thereof within the meaning of any constitutional or statutory provision."

It is provided that the rentals shall be set so that they are sufficient to pay, when due, all bonds and interest and to provide for all expenses of operation, including maintenance, and depreciation charges. Par. 11—74—11.

It is further provided that the powers which the Act confers upon municipalities are in addition and supplemental to the powers conferred by other laws, and that the limitations imposed therein shall not affect the powers conferred by any other law. The Act does not apply to any municipality which is a home-rule unit. (Par. 11—74—13.) It is agreed that the City of Salem is not a home-rule unit.

Pursuant to the provisions of the Act, the city council of the City of Salem adopted a resolution to create an industrial project under the terms of which it would acquire and construct a new manufacturing plant to be leased to Beatrice Foods Co.; bonds secured by a pledge of the rentals and a mortgage on the property were to be issued in the total sum of $1,000,000; and a lease agreement was to be signed, which provided rentals sufficient to retire the bonds. This was done in reliance upon a preliminary agreement signed by the parties. Thereafter, the mayor refused to sign the bonds and lease agreement, precipitating this action.

The bonds and lease agreement were duly authorized by the corporate authorities and the signature of the mayor to these instruments is purely a ministerial act. *Mandamus* is an appropriate form of action under these circumstances. *People ex rel. Ogilvie v. Lewis (1971), 49 Ill.2d 476, 491; People ex rel. City of Chicago Heights v. Richton (1969), 43 Ill.2d 267, 272, 273.*

The petitioner (City of Salem) claims that the constitutionality of the Act is to be determined under the Illinois constitution of 1970, and not that of 1870. The Illinois constitution of 1970, although ratified on December 15, 1970, did not become generally effective until July 1, 1971. The Act here before us was enacted by the General Assembly on June 29, 1971, but was not signed into law by the Governor until September 7, 1971. As noted by the City, the Act was obviously enacted in anticipation of the constitution of 1970, because of its reference to those municipalities which are home-rule units, a possibility not existing prior to the constitution of 1970. We have heretofore held that such legislation is to be tested under the new constitution, and particularly so when the enactment does not become a law until after July 1, 1971, the effective date of the 1970 constitution. *People ex rel. Oglivie v. Lewis (1971), 49 Ill.2d 476, 482.*

It is urged that the Act, in establishing a scheme for leasing and ultimately conveying the property to a private tenant, is not an enactment for public purposes and thus contravenes section 1(a) of article VIII of the 1970 constitution, which provides: "Public funds, property or credit shall be used only for public purposes." We assume,, without deciding, that public funds or property in some manner may be involved, and that the "public purpose" test must be met.

Section 11—74—3 of the Act, declares that its purpose is: to reduce conditions of unemployment and the evils attendant thereto, and to encourage the increase of industry within the State.

We recognize that the self-serving recitation of a public purpose within a legislative enactment is not conclusive of the existence of such purpose. (See: *Rosemont Bldg. Supply Inc. v. Ill. Highway Trust Authority (1970), 45 Ill.2d 243, 245.*) However, we stated in *People ex rel. Adamowski v. Chicago Railroad Terminal Authority (1958), 14 Ill.2d 230,* at page 235: "Such a legislative

declaration is not to be lightly set aside," and at page 236, we further stated: " 'Public purpose' is not a static concept. It is flexible, and is capable of expansion to meet conditions of a complex society that were not within the contemplation of the framers of our constitution. [Citations.] "

We have held on a number of occasions that if the principal purpose and objective in a given enactment is public in nature, it does not matter that there will be an incidental benefit to private interests. (*E.g., People ex rel. Adamowski v. Chicago Railroad Terminal Authority (1958), 14 Ill.2d 230, 236; People ex rel. Gutknecht v. City of Chicago (1953), 414 Ill. 600, 611, 612; Poole v. City of Kankakee (1950), 406 Ill. 521, 530; Cremer v. Peoria Housing Authority (1948), 399 Ill. 579, 591-592.*) While we acknowledge that there is a benefit to private interests in the financing of industrial projects under the Act, we hold that the principal purpose and objective of the Act is public in nature. Therefore, it does not matter that there will be an incidental benefit to private interests.

In *Cremer v. Peoria Housing Authority (1948), 399 Ill. 579,* at 588, we recognized that what is for the public good and what are public purposes are, in the first instance, questions for the General Assembly to determine; that the legislature is vested with a large discretion; that its determinations are entitled to full consideration; and that courts are not warranted in setting aside such an enactment unless it is clearly evasive of or contrary to constitutional prohibitions. We find no clear evasion of a constitutional prohibition relative to the Act meeting the public purposes standard.

It appears that as of this time the courts of approximately 31 States have found that industrial-project-revenue-bond statutes serve a public purpose. Legislatures in 48 States have adopted legislation to provide financing of this type. To date, court decisions in only 5 States have held such legislation invalid.

Typical of the approach of other courts to legislation of the type now before us are *Green v. City of Mt. Pleasant (1964), 256 Iowa 1184, 131 N.W.2d 5; City of Pipestone v. Madsen (1970), 287 Minn. 357, 178 N.W.2d 594,* and *City of Gaylord v. Beckett (1966), 378 Mich. 273, 144 N.W.2d 460,* wherein the Supreme Courts of these States approved their respective industrial-development acts and recognized that the consensus of modern legislative and judicial thinking is to broaden the scope of activities which may be classed as involving a public purpose. They all acknowledge that the broadest expansion is perhaps reached in the areas of economic welfare.

In *City of Pipestone,* the court also held that the initial responsibility for ascertaining what is a public purpose is for the General Assembly to determine; that the legislature is granted large discretion in making this determination; and that its enactments may be set aside by the courts only if clearly evasive of or contrary to constitutional prohibitions.

In *City of Gaylord, 378 Mich. 273, 298, 144 N.W.2d 460, 469-470,* the court, in upholding the legislation before it, quoted from *Harrison v. Claybrook (Okla. 1962), 372 P.2d 602,* and stated: "The consensus of modern legislative and judicial thinking is to broaden the scope of activities which may be classed as involving a public purpose. *** It reaches perhaps its broadest extent under the view that the economic welfare is one of the main concerns of the city, State and Federal governments."

In the final analysis, however, the validity of the statute must be tested under our constitution and our judicial decisions. Both our legislature and our courts have obviously adopted the expanding concept of "public purpose" in the area of economic welfare. Thus, we have approved legislation for the establishment of a railroad terminal authority with power to acquire railroad terminal facilities for lease to private railroads (*People ex rel.*

*Adamowski v. Chicago Railroad Terminal Authority (1958), 14 Ill.2d 230*); a Chicago regional port district with powers to improve port facilities and to sell and lease such facilities (*People ex rel. Gutknecht v. Chicago Regional Port Dist. (1954), 4 Ill.2d 363*); a land-clearance commission with power to acquire land in blighted areas, clear such land and sell it to purchasers whose plans for development had been approved (*People ex rel. Gutknecht v. City of Chicago (1953), 414 Ill. 600; Chicago Land Clearance Com. v. White (1952), 411 Ill. 310; Cremer v. Peoria Housing Authority (1948), 399 Ill. 579*); and legislation which authorized municipalities to acquire parking facilities for lease to a private operator (*Poole v. City of Kankakee (1950), 406 Ill. 521*). In all of the foregoing, and in many other similar instances, particular legislation has economically benefited private interests, but has been motivated by, and served, a more compelling public interest.

In *Hagler v. Small (1923), 307 Ill. 460,* the court had before it the validity of legislation providing compensation for veterans. The principal question raised was whether the Act imposed taxation for a public purpose or private benefit.

The court, on pages 474 and 475, set forth guidelines for this determination: "In deciding whether such purpose is public or private, courts must be largely influenced by the course and usage of the government, the object for which taxes and appropriations have been customarily and by long course of legislation levied and made, and what objects have been considered necessary to the support and for the proper use of the government. *** The power of the State to expend public moneys for public purposes is not to be limited, alone, to the narrow lines of necessity, but the principles of wise statesmanship demand that those things which subserve the general wellbeing of society and the happiness and prosperity of the people shall meet the consideration of the legislative body of the State, though

they ofttimes call for the expenditure of public money. If it can be seen that the purpose sought to be obtained is a public one and contains the elements of public benefit, the question how much benefit is thereby derived by the public is one for the legislature and not the courts. *** In determining whether or not the sovereign taxing power is used in the public interest, the judgment of the legislature is to be accepted in the absence of a clear showing that the purported public purpose is but an evasion and that the purpose is, in fact, private."

We believe that conditions of unemployment within the State are well known and need no documentation. Legislation intended to alleviate these conditions and their inherent problems certainly is in the public interest. New and expanded industry in communities within the State provides work and opportunities not only for those who would be directly employed, but also for others who provide goods and services to those who live and work in the community. The type of financing contemplated by the Act may well provide a means for small and struggling communities to attract economic development. The potential impetus to economic development within our State, which otherwise might be lost to other States with financing of this type, likewise serves the public interest. The private benefit resulting from the Act is incidental to the public purpose and benefit to be served, and there is no contravention of the constitution in this regard.

The respondent contends that the issuance of the bonds under the Act, the leasing and the ultimate sale of the industrial project to private interests all constitute a loan of a city's credit in violation of the due-process clause of section 2 of article I of the Illinois constitution of 1970 and the fourteenth amendment to the United States constitution.

Our decisions under the State constitution of 1870, which specifically prohibited the extending. of any credit by any political subdivision to any corporation (Ill. Const.

(1870), art. IV, sec. 20), and which encompass the due-process question here raised (*Schuler v. Board of Education (1938), 370 Ill. 107, 109*), lead us to conclude that the respondent's contention is without merit. We have indicated that there is no constitutional prohibition against the use of public funds which inure to the benefit of private interests, so long as the money is utilized for a public purpose. The only constitutional prohibition is against the State contracting debts as a guarantor or surety and, in essence, loaning its credit to others. *Continental Ill. Nat'l Bank v. Illinois State Toll Highway Com. (1969), 42 Ill.2d 385, 403; Fairbank v. Stratton (1958), 14 Ill.2d 307, 315; Poole v. City of Kankakee (1950), 406 Ill. 521, 531.*

In *Bowes v. Howlett (1962), 24 Ill.2d 545,* we held that the Illinois Industrial Development Authority Act must fail because its implementation was entirely dependent upon a fund to be raised by appropriations from the General Assembly. The fund could not exist without the appropriations. The fund was to pay for the cost of debt service resulting from the sale of bonds. It was, hence, a pledge of the State credit and unconstitutional. In passing, we noted that the issuance of bonds payable solely from revenues derived from the use of a facility has become a popular method of municipal financing and has been interpreted by the courts of our State not to be subject to many of the constitutional restrictions imposed upon obligations payable by taxation. 24 Ill.2d at 549.

Under the Act in question, there is no guarantee fund and there is no pledge of public credit or funds. The bonds constitute a lien upon the rentals to be received from the industrial user, and the bonds may be secured by a mortgage of the property involved, but that does not constitute a loan of the municipality's credit. No right is thereby given to compel a municipality, under any circumstances, to use its revenues to retire the debt. The Act expressly prohibits such a result and recites that the bonds do not constitute either an indebtedness of, or a

loan of credit from, the municipality. (Par. 11—74—10.) While this declaration is self-serving and not conclusive (*Rosemont Bldg. Supply, Inc. v. Illinois Highway Trust Authority (1970), 45 Ill.2d 243, 245*), it is patently expressive of the legislature's intent and is an accurate statement of the results attained under the Act.

The cases cited by the respondent as indicating there is a denial of due process under the Act actually illustrate his argument to be inapposite. The cases state that it is a violation of due process to appropriate money for any purpose in a private law. (*Chicago Motor Club v. Kinney (1928), 329 Ill. 120, 130; Cremer v. Peoria Housing Authority (1948), 399 Ill. 579, 586.*) We hold that there is neither a taking of a taxpayer's money to finance the contemplated project, nor are the funds in question used for a private purpose.

The respondent's suggestion that there is, in sub-stance, a use of taxpayer's money because city officials must devote a substantial amount of time in carrying out the project is without merit. The contract documents amply demonstrate that the corporate trustee is respon-sible for disbursing the bond proceeds, collecting and distributing the rents, paying the principal and interest due on the bonds, and for handling ensuing litigation. The municipal authorities must enact the resolution and sign the documents to bring the project into existence, but the subsequent construction, operation and the payment of financial obligations attendant thereto is primarily in the charge of others.

Closely akin to the foregoing contentions is the argument that the Act permits the imposition of a debt of the municipality in excess of that permitted by section 8—5—1 of the Illinois Municipal Code (Ill.Rev.Stat. 1971, ch. 24, par. 8—5—1). As noted before, the Act specifically prohibits the right to compel the municipality to exercise any taxing power to pay the bond principal or interest. We previously have held that bonds payable directly from

revenues of a project such as the one now before us do not constitute debts of the municipality. (*People ex rel. Gutknecht v. Chicago Regional Port Dist. (1954), 4 Ill.2d 363, 377; People v. Illinois Toll Highway Com. (1954), 3 Ill.2d 218, 228; People ex rel. Gutknecht v. City of Chicago (1953), 414 Ill. 600, 619; Krause v. Peoria Housing Authority (1939), 370 Ill. 356, 370.*) In each of these cases we have held that when the obligation is to be paid solely from the income derived from the property purchased by the use of the bonds, no municipal indebtedness is incurred. *A fortiori,* the fact that the bonds are secured by the property so purchased does not create a municipal indebtedness. *Hairgrove v. City of Jacksonville (1937), 366 Ill. 163, 176-178.*

Nor, is there a denial of due process under the theory that the conveyance of the property at the termination of the lease to the private industry at a nominal sum is a donation of public property. The municipality does not invest its funds for the purchase of the property. Private bondholders have invested their funds. The private industry, prior to a conveyance to it under section 11—74—11 of the Act, will have paid for what it receives by way of rentals, or, in the event of sale under section 11—74—4(6), it will have paid the required purchase price as determined by the municipality, subject to the outstanding mortgage, and the Act provides that no sale or conveyance shall ever be made in such manner as to impair the rights or interests of the holder or holders of the bonds which are issued.

In *Cremer v. Peoria Housing Authority (1948), 399 Ill. 579,* the court disposed of the contention that there was a donation of property by the municipality to a private corporation by stating that the agreement of the private corporation to undertake the development of the project represented adequate consideration for the transfer of property to it. It stated that the constitutional prohibition against making a donation to a private corporation did not bar the municipality from entering into a

transaction where there was an exchange of consideration between the parties. (399 Ill. at 594.) We conclude that there likewise is no denial of due process where, as here, the tenant has agreed to pay the entire cost of the project through rental payments, or otherwise, before there can be a transfer of the property to it.

The respondent also contends that a referendum is necessary for the issuance of bonds under this Act by reason of the provisions of section 8—4—1 of the Illinois Municipal Code (Ill.Rev.Stat. 1971, ch. 24, par. 8—4—1). The petitioner concedes that section 8—4—1 generally requires that the authorization of bonds be submitted to the electors and that the enumerated exceptions thereto do not include the Act in question. It suggests that there may have been an oversight on the part of the legislature in failing to provide such an exception because the bill, as originally considered, contained a provision requiring that the question of the approval of the bonds be submitted to the voters. However, the bill was subsequently amended and, as enacted, provides that bond issues may be approved by the affirmative vote of three fifths of the corporate authorities. (Par. 11—74—6.) Additionally, section 11—74—13 of the Act specifically provides that " *** bonds may be issued under this Division *** without regard to the requirements, restrictions, limitation [*sic*] or other provisions contained in any other law."

Section 8—4—1 of the Illinois Municipal Code, which became effective July 1, 1971, and section 11—74—13 of the Industrial Project Act, which became effective September 7, 1971, are *in pari materia* and should, if possible, be construed together so as to render them consistent. (*Richards v. Board of Education (1960), 21 Ill.2d 104, 113; People ex rel. Adamowski v. Metropolitan Sanitary Dist. (1958), 14 Ill.2d 271, 283.*) Section 11—74—13 specifically provides that the bonds may issue without regard to the requirements of any law other than that contained in Division 74 and that the powers therein

conferred are in addition and supplemental to the powers conferred by any other law. We believe that the pointed expression of exemption from other provisions of law are adequate to amend by implication what otherwise would be the requirements imposed by section 8—4—1, in that an implied repeal results from an enactment, the terms and necessary operation of which cannot be harmonized with the terms and effect of an earlier act. Under such circumstances, the later expression prevails since it cannot be presumed that the legislature intended to enact laws which are contradictory. *Rosehill Cemetery Co. v. Lueder (1950), 406 Ill. 458, 465, 466; Klemme v. Drainage District No. 5 (1942), 380 Ill. 221, 224;* also see: *City of Lawrenceville v. Hennessey (1910), 244 Ill. 464, 467-468.*

The respondent also contends that because of its limitation to industrial or manufacturing plants and to non-home-rule municipalities, the Act violates the equal-protection clause of section 2 of article I and constitutes special legislation under section 13 of article IV of the Illinois constitution of 1970.

A statute will not be construed as denying equal protection of the law unless the classifications complained of are arbitrary and not based upon a rational difference of condition or situation in relation to the legislative purpose. *Stein v. Howlett (1972), 52 Ill.2d 570; Fanio v. John W. Breslin Co. (1972), 51 Ill.2d 366, 368; King v. Johnson (1970), 47 Ill.2d 247, 250; Begich v. Industrial Com. (1969), 42 Ill.2d 32, 35.*

In *Bridgewater v. Hotz (1972), 51 Ill.2d 103,* we considered the provisions and requirements of section 13 of article IV of the 1970 constitution, and at page 110 we concluded that although the scope of judicial review of legislation is enlarged thereby, "section 13 requires no change in our definition of when a law is 'general and uniform,' 'special,' or 'local.' "

In *People ex rel. Vermilion County Conservation Dist. v. Lenover (1969), 43 Ill.2d 209,* we held that the

prohibition against special laws does not mean that a law must affect every person and every place in the State alike, and at pages 217 and 218, we stated:

"It means simply that a law shall operate uniformly throughout the State in all localities and on all persons in like circumstances and conditions. [Citations.]

"Establishing classifications is primarily a legislative function. [Citations.] Classifications made by the legislature need not be logical, harmonious, scientific or even accurate, provided they will accomplish the legislative design and are not arbitrary. [Citations.] Only if it can be said that the classification is clearly unreasonable and palpably arbitrary will a court declare the statute invalid. [Citations.] And 'A distinction in legislation is not arbitrary if any state of facts can reasonably be conceived that would sustain it, ***.' [Citations.] Summarizing, a legislative classification is sustainable where founded upon a rational difference of situation or condition existing in persons or objects upon which the class [sic] rests, and where there is a reasonable basis for the classification in light of the objects and purposes to be accomplished. [Citations.]"

In limiting this course of financing to industrial and manufacturing plants, the legislature might reasonably have determined that the competitive harm suffered by the presence of another local commercial or service business would more than offset the gain in employment and economic development otherwise intended under the Act. Also, the amount of investment customarily required by industrial or manufacturing plants, as opposed to commercial establishments, presents a rational basis for the classification. We agree that in those communities which presently are rural in character and lack economic development, the first step towards providing employment and

growth is most apt to be found in establishing an industrial base from which service and commercial enterprises may follow.

While the Act applies only to non-home-rule municipalities, we do not believe that its language necessarily means that such a vehicle for economic development is unavailable to home-rule municipalities. Section 6(a) of article VII of the constitution of 1970 sets forth the inherent powers of a home-rule unit:

> "*Except as limited by this Section,* a home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt." (Emphasis added.)

Subsection (m) states:

> "Powers and functions of home rule units shall be construed liberally."

The constitutional grant of power to home-rule municipalities appears to be of sufficient breadth and scope to authorize such entities to adopt this vehicle for economic development; and if they choose to do so, the precise procedures for the accomplishment of such result would be left to the determination of the respective units. (See: *S. Bloom, Inc. v. Korshak (1972), 52 Ill.2d 56.*) We grant that the Act before the court in this case permits the municipalities which are subject to it to acquire by gift or purchase land up to ten miles outside of their territorial boundaries. (Ill.Rev.Stat. 1971, ch. 24, par. 11–74–4(1).) However, the constitution does not suggest that home-rule units would be unable to purchase land outside of their territorial units.

The acquisition of land by purchase or gift is not an exercise of a governmental power; it is an act of a proprietary nature. Where not expressly prohibited, a municipal corporation may purchase real estate outside of its corporate limits for legitimate municipal purposes. (*Ill. Power Co. v. City of Jacksonville (1960), 18 Ill.2d 618,*

*621; City of Champaign v. Harmon (1881), 98 Ill. 491, 494-495;* 10 McQuillin, Municipal Corporations (3d ed. 1966), sec. 28.05.) However, there is a distinction between the right to acquire property outside of its corporate limits and the power to exercise rights of sovereignty over such property. (*McLaughlin v. City of Chattanooga (1944), 180 Tenn. 638, 177 S.W.2d 823; Baker v. City of Palo Alto (1961), 190 Cal. App. 2d 744, 754, 12 Cal. Rptr. 425, 430.*) Under the Act in question, the city of Salem exercises no rights of sovereignty over the property under consideration. Also, various statutory provisions recognize the rights of municipalities to purchase land outside of their territorial limits for appropriate purposes. See: Ill.Rev.Stat. 1971, ch. 24, par. 11—76.1—1; Ill.Rev.Stat. 1971, ch. 120, par. 500.6.

The language of the constitution in the grant of power to home-rule units may raise some questions as to the extent of power to exercise sovereignty beyond corporate limits (see: Baum, A Tentative Survey of Illinois Home Rule (pts. 1-2), 1972 U. Ill. L.F. 137, 559), but the language does not warrant the inference that a home-rule municipality is unable to act in a proprietary capacity beyond its corporate limits. To the contrary, the constitution states that "a home rule unit may exercise any power and perform any function pertaining to its government and affairs." The Act, applicable only to non-home-rule municipalities, does not confer authority to exercise governmental powers with respect to real property beyond the corporate limits of such municipality. It only provides that such a municipality may acquire such land by gift or purchase. No right to act in other than a proprietary capacity is given.

Since neither the Act in question nor the constitution prohibits a home-rule unit from adopting a similar enactment, we do not find a denial of due process or equal protection of the law, nor do we find special legislation resulting from the Act. Additionally, we have repeatedly

held that if there is a doubt as to the construction to be given to a legislative enactment the doubt must be resolved in favor of an interpretation which supports its validity. *S. Bloom, Inc. v. Korshak (1972), 52 Ill.2d 56, 64; Huckaba v. Cox (1958), 14 Ill.2d 126, 131.*

Next, the respondent contends that the Act violates public policy in that it authorizes a municipality to engage in the real-estate business in competition with private enterprise. We find this to be an unreal analysis of the results under the Act. The principal function of the municipality is to provide a means or method whereby funds may be raised to acquire industrial facilities through the issuance of revenue bonds. The municipality does not in any real sense operate the project. Suitable land owned by any private person is a prospect for purchase. The subsequent lease by the municipality is nothing more than an integral part of the method of making financing available. We find no contravention of public policy in this regard.

Sections 11—74—11 and 11—74—4(3) of the Act provide that rentals under any lease are to be sufficient to provide a fund for the payments of all bonds, principal and interest, the operation and maintenance of the project, and for depreciation. The respondent claims that under the lease in question, the rentals are not sufficient to pay for the operating, maintenance and depreciation charges.

It is true that the rental charges are adequate only to provide for the debt service on the bonds and to pay the trustee's fees. However, under the terms of the lease all of the expenses of operation and maintenance and ownership are directly assumed by the tenant. In our opinion this satisfies the requirements of the Act, and there is no need to provide that the municipality be an intermediary for the payment of these charges. We find that the substance of the requirements of the Act in this respect is met by the provisions of the lease.

The respondent also contends that under the Act,

personal property, consisting of machinery and equipment, is exempt from taxation, and that such exemption results in an improper classification. Section 11—74—4 of the Act provides that machinery and equipment may be acquired in connection with the industrial project. Section 11—74—4, among other things, provides:

> "Property acquired by any municipality pursuant to the provisions of this Division 74 shall be exempt from the imposition and collection of taxes thereon while owned by the municipality, but the use of such property is subject to taxation to be paid by the lessee or occupant as provided in Section 26 of the 'Revenue Act of 1939', filed May 17, 1939, as now or hereafter amended."

The 1969 amendment to section 26 of the Revenue Act of 1939 (Ill.Rev.Stat. 1969, ch. 120, par. 507) was held to be invalid in *Dee-El Garage, Inc. v. Korzen, 53 Ill. 2d 1,* and the provisions for taxing leasehold interests in tax-exempt property, as contained in section 26 before the 1969 amendment, were therein held to remain in force. This section, however, applies only to the taxation of a leasehold interest in real estate and does not relate to the taxation of personal property. We do not read section 11—74—4(7) to mean that the taxation is limited to the leasehold interest in real property. The quoted portion of section 11—74—4(7) provides that "property acquired" shall be exempt from taxation but that the use thereof shall be taxed as provided by section 26 of the Revenue Act, and under *Dee-El Garage, Inc.,* such reference is to section 26 as it existed prior to the 1969 amendment. We believe that the legislature in using the term "property acquired" referred only to the real-estate interest which is subsequently leased, and that any personal property included along with such interest in the real estate would be subject to taxation in the same manner as all other personal property.

The respondent further contends that the financing of industrial projects for private industry is not a "corporate purpose." Section 8—1—2 of the Municipal Code, which

became effective June 16, 1970, provides that corporate authorities may appropriate money only for corporate purposes. (Ill.Rev.Stat. 1971, ch. 24, par. 8—1—2.) While we do not regard the bond proceeds and rental payments as appropriations by the petitioners, even if we assume that they were, we believe that our decision in *People v. City of Chicago (1952), 413 Ill. 83,* is sufficient answer to this contention. We there upheld an appropriation for a civil defense fund as for a valid corporate purpose, stating that the words "corporate purpose" are not to be given a narrow or rigid construction and that the use of funds in a manner which will promote the general prosperity and welfare of the municipality is for a proper "corporate purpose." (413 Ill. 83, at 87-89.) Additionally, section 11—74—13 of the Act, which became effective September 7, 1971, specifically states that the provisions of the Act are in addition and supplemental to powers conferred by any other law. Under the rules of construction heretofore referred to relative to the respondent's contention that a referendum was necessary for the issuance of bonds under the Act, we find this final contention to be without merit.

In view of these conclusions, we hold that the writ of *mandamus* should be awarded.

*Writ awarded.*

MR. JUSTICE SCHAEFER, dissenting:

In my opinion the majority fails in its effort to sustain the constitutionality of the last sentence of section 11—74—13 which provides that the Act "does not apply to any municipality which is a home rule unit." (Ill. Rev. Stat. 1971, ch. 24, par. 11—74—13.) And because this provision can not be characterized as severable, it follows, in my opinion, that the entire Act is invalid.

The sentence in question forbids home-rule municipalities to exercise a power that the legislature has granted to all other municipalities. The majority first justifies this discrimination on the ground that the line which is drawn

between home-rule municipalities and other municipalities is reasonably related to the purpose of the Act. The necessary relationship is said to exist because: "The type of financing contemplated by the Act may well provide a means for small and struggling communities to attract economic development", and also because "in those communities which presently are rural in character and lack economic development, the first step toward providing employment and growth is most apt to be found in establishing an industrial base from which service and commercial enterprises may follow."

This first justification rests upon two assumptions: (1) that the purpose of the Act is to attract industrial development to the more rural areas of the State, and (2) that whether a city or village is a home-rule municipality is determined by its population. Neither assumption is true. The General Assembly stated that the purpose of the Act is "to relieve conditions of unemployment, to aid in the rehabilitation of returning veterans, and to encourage the increase of industry within this State, thereby reducing the evils attendant upon unemployment." (Par. 11—74—3.) There is no suggestion of any legislative purpose to attract industry to "those communities which presently are rural in character and lack economic development," or to "provide a means for small and struggling communities to attract economic development." The further assumption that the line between home-rule and non-home-rule municipalities depends upon population is also unfounded. The constitution provides (art. VII, secs. 6(a), (b)) that any city, village or incorporated town, regardless of its population, may determine for itself, by referendum, whether or not it will be a home-rule unit.

This statute interferes with the freedom of choice that the constitution has given by saying to the people of a municipality, "You may have the power granted by this act only if you give up your status as a home-rule unit", or conversely, "If you become a home-rule unit you must

give up the power granted by this act." In my opinion the legislature lacks the authority to interfere with the freedom of choice granted by the constitution by imposing conditions of this kind.

Finally, the opinion seems to say that the limitation stated in section 11—74—13 is meaningless, and therefore does not affect the validity of the Act. I can not agree that a home-rule unit, solely by virtue of its home-rule status, has the power granted to other municipalities by this statute to purchase land up to ten miles outside its limits, or that the making of such a purchase is not the exercise of a governmental power or function.

To support the existence of such a power the majority relies upon two decisions of this court. In one of these, *Illinois Power Co. v. City of Jacksonville (1960), 18 Ill.2d 618,* the power in question had been specifically granted by the legislature. In the other, *City of Champaign v. Harmon (1881), 98 Ill. 491,* the only thing the court said with reference to the power of a municipality to purchase land outside its boundaries was this: "Under a general grant of power to buy and hold real property, it is understood municipal corporations may buy and hold such property, within the corporate limits, as may be necessary for corporate purposes, and may even buy and hold real estate beyond the corporate limits, for the location of cemeteries, pest houses, and other purposes connected with the sanitary condition of the municipality." 98 Ill. at 494-5.

In addition to those two decisions of this court, the majority relies upon a distinction which it draws as to the kind of authority that may be exercised by a municipality over property which it owns outside its boundaries. To support this distinction the opinion relies upon a Tennessee decision. That case involved an express legislative grant of authority to the city of Chattanooga to acquire land outside its corporate limits for an airport. The statement relied upon by the majority was concerned with

land lying beyond the borders of the State of Tennessee, and not with land beyond the city limits. (See *McLaughlin v. City of Chattanooga (1944), 180 Tenn. 638, 643, 177 S.W.2d 823, 825.*) The authority which the Illinois General Assembly has granted to all Illinois municipalities is expressed in the following statute:

> "All property which (1) is owned by a municipality, and (2) lies outside the corporate limits of the municipality, and (3) does not lie within the corporate limits of any municipality, shall be subject to the ordinances, control, and jurisdiction of the municipality in all respects the same as the property owned by the municipality which lies within the corporate limits thereof." Ill. Rev. Stat. 1971, ch. 24, par. 7—4—2.

More serious than the majority's mistake as to the nature of the power that the General Assembly has granted to municipalities over property which they own outside of their limits, is the mistake that is made with respect to the constitutional power of a home-rule municipality to acquire land beyond its borders without legislative authority.

The proceedings of the Constitutional Convention make it quite clear that it was not intended that the home-rule article should grant that authority. The majority proposal of the Local Government Committee was as follows:

> "3.1(a) Any county which has a chief executive officer elected by the voters of the county and any municipality which has a population of more than 20,000 may, *within its corporate limits*, exercise any power and perform any function pertaining to its government and affairs ***." (Emphasis added.) 7 Record of Proceedings, Sixth Illinois Constitutional Convention 1599 [hereinafter cited as Proceedings].

The minority of the committee would have substituted the following for the majority proposal:

> "Section 3.1(a) Any city, village, and incorporated town may, *within its corporate limits*, exercise any power and perform any function pertaining to its government affairs ***." (Emphasis added.) 7 Proceedings 1866.

During the debates Delegate Elward stated that as he read the proposal the legislature would have no authority to grant home-rule municipalities any extraterritorial power. He said:

> "Well, may I respectfully suggest that in the absence of constitutional backing for the existing statutory authority, any attempt by the General Assembly to pass a statute giving municipalities power outside the boundaries of the municipality would be open to serious and, I think, substantial constitutional attack." 4 Proceedings 3040.

Both the chairman and the vice-chairman of the Local Government Committee stated that there was nothing in either proposal to prevent the General Assembly from granting additional powers. Chairman Parkhurst stated:

> "The powers granted in section 3 are not powers that come by way of statute. It is not—these are autonomous powers that home rule units can exercise within their corporate limits without regard to statutory enablement, point 1.
>
> Point 2, there is nothing in this article that in any way prevents the legislature from granting additional powers to any unit of local government other than the powers that are granted constitutionally." 4 Proceedings 3040.

Vice-Chairman Carey stated:

> "There is nothing to prevent the General Assembly from acting outside the city limits of any municipality, either in this or the minority report, and the reason being that the powers we seek are within the city limits. And I don't think that there's any doubt but what the General Assembly now has and will continue to have—without putting it into the constitution—the right to legislate for extra-territorial powers." 4 Proceedings 3040.

Mr. Elward had not argued that the constitution should give home-rule units power over territory outside their boundaries. Rather, he had argued that the language proposed would prevent the legislature from giving home-rule units extraterritorial power. (4 Proceedings at 3040-41.) This is clearly shown by the amendment he and Delegate Gertz proposed:

> "3.1(a) Any county which has a chief executive officer elected by the voters of the county and any municipality which has a population of more than 20,000 may, within its corporate limits *and such additional areas as have been or shall be provided by law,* exercise any power and perform any function pertaining to its government and affairs \*\*\*." (The amendment would have added the italicized words.) 4 Proceedings 3072.

This amendment did not purport to give any additional powers to home-rule units but merely to preserve the authority of the legislature to grant extraterritorial power to them, as Delegate Elward clearly stated:

> "All the amendment before you does is say that the counties and the cities can have this home rule power, not only within their corporate limits, but in such additional areas as in the past the General Assembly has given them the power or as the General Assembly may give them the power in the future." 4 Proceedings 3074.

The amendment was defeated, but the proceedings of the Convention show that both its proponents and its opponents were in complete agreement that the extraterritorial powers of home-rule municipalities were to be derived from the legislature and not from the constitution.

By section 6(a) of article VII of the constitution, a home-rule unit "may exercise any power and perform any function pertaining to its government and affairs \*\*\*." In my opinion the purposes of this Act—"to relieve conditions of unemployment, to aid in the rehabilitation of returning veterans, and to encourage the increase of industry within this State"—are matters that pertain to "the government and affairs" of the State. They become matters that pertain to the government and affairs of a municipality, whether home-rule or not, only pursuant to a delegation of authority from the General Assembly.