(No. 49255.—

THE PEOPLE *ex rel.* THE CITY OF URBANA, Appellee, v. HIRAM PALEY, Mayor, Appellant.

*Opinion filed October 5, 1977.*

Harvey Schwartz, of Schwartz & Zaban, of Chicago, for appellant.

Jack Waaler, City Attorney, of Urbana, and Ross, Hardies, O'Keefe, Babcock & Parsons, of Chicago (R. Marlin Smith and Jeffrey R. Ladd, of counsel), for appellee.

MR. JUSTICE RYAN delivered the opinion of the court:

This is an appeal by Hiram Paley, the mayor of the city of Urbana, from a judgment of the circuit court of Champaign County in a *mandamus* proceeding brought on behalf of the city against the mayor. The action was instituted in response to the mayor's refusal to execute certain general obligation bonds and interest coupons authorized by the Urbana city council for the purpose of acquiring a parcel of land as part of an urban development program. The mayor, in a letter to the city council, explained that he refused to sign the bonds because their issuance for the purpose contemplated would violate the Constitution of the State of Illinois in that it "would constitute the taking of private property for a private use and the expenditure of public funds and the lending of public credit for private (as opposed to public) purposes." The circuit court disagreed and, on the basis of the pleadings and a stipulation of fact, granted the *mandamus* requested on behalf of the city. The mayor appealed to the appellate court, and the cause was transferred to this court pursuant to our Rule 302(b) (58 Ill. 2d R. 302(b)).

Both parties to this dispute agree that by 1974 the central business area of the city of Urbana suffered from a serious case of urban blight. The symptoms were general economic deterioration and a proliferating number of vacant buildings and buildings with structural and mechanical infirmities. The city, in an effort to arrest the spread of blight in downtown Urbana, authorized Arthur Rubloff and Co. to study the business area and make recommendations. The Rubloff report concluded that a commercial renewal project must be undertaken to prevent any further deterioration. In the absence of such a project, "properties will continue to decline in economic value, more stores will become vacant, and the *** area will continue to change from a retail area to a service area. Little new construction will occur, although financial institutions and government offices may expand and upgrade facilities as needed. In time, tax revenues from the Downtown will be less than the cost of services to the area, meaning increased Real Estate taxes." Further, the report recommended that, to make the project economically feasible, the city should play an active role in its implementation. We might note here that the authority of the city, as a home rule unit, to undertake a program of urban redevelopment is not in dispute herein, having been conceded by both parties. (See also *City of Urbana v. Houser,* 67 Ill. 2d 268.) We are not, therefore, called upon in this case to assess the propriety of the city's objective, but rather to determine the constitutional validity of the means used by the city to achieve that end.

The Rubloff report appraised and enthusiastically approved a redevelopment plan proposed by a local developer, Broadway Development Corporation. The plan, in brief, calls for the expansion of Lincoln Square Mall, an existing shopping facility, -by constructing an adjacent commercial center with space for a retail area, offices, and a bank. Moreover, as stated in the report:

"The proposal contains as a key element the participation of the City in the total redevelopment program; the City is to acquire the land necessary for the development, make street alterations and other public improvements, and provide parking facilities."

Subsequent to receipt of the Rubloff report, the Urbana city council passed a series of ordinances to implement the recommendations of the report and the proposed redevelopment plan or one similar to it, though no particular developer has yet been chosen. The first of these was Ordinance No. 7374–70, adopted on May 1, 1974. Section 5 of the ordinance enumerates the powers which the city council may choose to exercise in carrying out the redevelopment plan:

"(A) To approve all development and redevelopment proposals for business districts created in the City of Urbana pursuant to this ordinance.

(B) To exercise the power of eminent domain for the acquisition of real and personal property for the purpose of implementing a development or redevelopment plan for such business district or a development or redevelopment project for which provision is made in such a plan.

(C) To acquire, manage, convey or otherwise dispose of real and personal property acquired pursuant to the provisions of a development or redevelopment plan.

(D) To apply for and accept capital grants and loans from the United States and the State of Illinois, or any instrumentality of the United States or the State, for business district development and redevelopment.

(E) To borrow funds as it may be deemed necessary for the purpose of business district development and redevelopment, and in this connection issue such general obligation or revenue bonds as it shall be deemed necessary, subject to such limitations as the General Assembly of the State of Illinois may hereafter impose pursuant to Section 6(k) of Article VII of the 1970 Constitution of the State of Illinois.

(F) To enter into contracts with any public or private agency or person for the purpose of business

district development and redevelopment.

(G) To sell, trade, or improve such real property as may be acquired in connection with business district development and redevelopment plans and to provide by ordinance for the procedures that shall be employed in the sale or trade of any such real estate.

(H) To employ all such persons as may be necessary for the planning, administration and implementation of business district plans.

(I) To expend such public funds as may be necessary for the planning, execution and implementation of the business district plans.

(J) To establish by ordinance or resolution procedures for the planning, execution and implementation of business district plans."

The final ordinance in the series was No. 7475—104, adopted on June 2, 1975. That ordinance provided for the borrowing of $40,000 for the purpose of acquiring a specified parcel of land for redevelopment. In evidence of that indebtedness, the ordinance provided for the issuance of eight general obligation municipal bonds, each of the denomination of $5,000 and bearing interest at the rate of 5%. Each bond further recites that "[f]or the prompt payment of this bond, both principal and interest, as aforesaid, at maturity, and the levy of taxes sufficient for that purpose, the full faith, credit and resources of said City are hereby irrevocably pledged." The subsequent refusal of the mayor to sign these bonds led to the *mandamus* action which is the subject of this appeal.

As aforementioned, we are concerned in this case with the method chosen by the city to assist in the redevelopment of the downtown area. More specifically, we must decide upon the constitutionality of the financing scheme employed to raise money for land acquisition. The mayor argues that the issuance of general obligation bonds to finance the proposed development is a violation of both the due process clauses of the Federal and State constitutions and section 1(a) of article VIII of the Illinois

Constitution, which provides:

"Public funds, property or credit shall be used only for public purposes."

It has long been held that the imposition of a tax for other than a public purpose constitutes a violation of the due process clause of the fourteenth amendment to the Federal Constitution (*Green v. Frazier*, 253 U.S. 233, 64 L. Ed. 878, 40 S. Ct. 499), and of the Illinois Constitution of 1870 (*Cremer v. Peoria Housing Authority*, 399 Ill. 579). In *Schuler v. Board of Education*, 370 Ill. 107, 109, the court stated: "We have expressly decided that the application of tax money for other than public purposes is a deprivation of property without due process of law." The court cited *Robbins v. Kadyk*, 312 Ill. 290, which repudiated a due process attack on a bond issue to finance construction of a community building because such construction was for a public purpose.

In addition to the due process restriction, article IV, section 20, of the Illinois Constitution of 1870 contained the following specific limitation:

"The State shall never pay, assume or become responsible for the debts or liabilities of, or in any manner give, loan or extend its credit to, or in aid of any public or other corporation, association or individual."

It has been suggested that such limitations found in State constitutions are not intended to be coextensive with the public-purpose limitation of the fourteenth amendment but are specific limitations not satisfied solely by the finding of a public purpose to be served by the questioned project. See Comment, *State Constitutional Provisions Prohibiting the Loaning of Credit to Private Enterprise—A Suggested Analysis*, 41 U. Colo. L. Rev. 135 (1969), and Willatt, *Constitutional Restrictions on Use of Public Money and Public Credit*, 38 Tex. Bar J. 413 (1975).

This court, however, has not given an expansive interpretation to the limitations of article IV, section 20,

but has held that this section does not prohibit the appropriation of State funds to private corporations or individuals where the money appropriated is to be spent for a public purpose. (*Poole v. City of Kankakee,* 406 Ill. 521, 531; *Cremer v. Peoria Housing Authority,* 399 Ill. 579, 587; *People ex rel. McDavid v. Barrett,* 370 Ill. 478; *Hagler v. Small,* 307 Ill. 460.) In *Fairbank v. Stratton,* 14 Ill. 2d 307, the purchase by the State of a $25 million revenue bond issue of the Metropolitan Fair and Exposition Authority was approved. This court stated:

"The transaction in question involves only a purchase or loan. There is a loan of State funds, not of State credit. The State is not undertaking to become a surety or guarantor of payment of the bonds. It would be in the position of a creditor, rather than that of a debtor which arises upon a loan of credit." (14 Ill. 2d 307, 315.)

In *Continental Illinois National Bank & Trust Co. v. Illinois State Toll Highway Com.,* 42 Ill. 2d 385, the court approved an appropriation of money from the Road Fund to the Illinois State Toll Highway Authority for the payment of "ordinary and contingent expenses" necessary to finance certain studies. The act in that case provided for the repayment of this money to the State Treasurer. This was held to be a loan of money and not a violation of section 20. The court stated that the purpose of section 20 is to prohibit the State from contracting debts as a guarantor or a surety, so as to protect the State from incurring an excessive public indebtedness. (42 Ill. 2d 385, 403.) In *People ex rel. City of Salem v. McMackin,* 53 Ill. 2d 347, after reviewing the decisions of this court construing article IV, section 20, the court in summary stated: "The only constitutional prohibition is against the State contracting debts as a guarantor or surety and, in essence, loaning its credit to others." 53 Ill. 2d 347, 359.

There is a substantial difference between the language

of article VIII, section 1(a), of the 1970 Constitution and that of article IV, section 20, of the 1870 Constitution. The language of the latter appears as an absolute prohibition against extending the State's credit regardless of the purpose for which it is extended. However, the language of article VIII, section 1(a), of the 1970 Constitution puts the same restriction on the use of public credit as is placed on the use of public funds; that is, it must be for a public purpose. It would therefore appear that the restriction heretofore placed on the use of public credit, as summarized in *McMackin,* is no longer valid.

In explaining section 1 of the proposed finance article of the 1970 Constitution, now found in article VIII, section 1(a), Delegate Cicero stated to the constitutional convention:

> "The first sentence of this section is intended explicity to reaffirm the general rule that public monies cannot be taken or applied for private purposes but can only be applied to public purposes. Indeed, there are many holdings in this state and others that affirm that general rule and provide that to use public monies for private purposes is a violation of due process.
>
> *** We intend this provision to allow the state's credit to be used to guarantee debts of local governments, for example, to allow the state to enter into arrangements with development corporations, other types of nongovernmental corporations, so long as public purposes are served thereby.
>
> It is the feeling of the committee that in the age we live in many of these types of enterprises are going to be undertaken, as they are at the present time, through various types of ventures—cooperative ventures—between nongovernmental corporations and state or local governments; and this is intended to allow that type of thing so long as a public purpose is served." 2 Record of Proceedings, Sixth Illinois Constitutional Convention 869 (hereinafter cited as Proceedings).

Also Delegate Cicero, in continuing his explanation of the proposed language of the new constitution, stated:

"It may broaden the present law ***. It is intended to remove any question of the right of the state to loan or extend its credit in aid of a public purpose." 2 Proceedings 870.

The report of the committee on Revenue and Finance of the constitutional convention, upon submitting its proposal to the convention, explained the language that is now article VIII, section 1(a), as follows:

"The first sentence limits the use of public funds, property and credit to a public purpose. It permits the state and its political subdivisions to enter into financial arrangements with governmental or non-governmental organizations whenever a public purpose will be served thereby." (7 Proceedings 2009.)

Under the heading "Present Provisions and Reasons for Change," the committee report continues:

"Article IV, Section 20, of the present constitution prohibits the state from assuming the debts of or loaning credit to any public or private corporation or individual. *** The proposed language removes the prohibition against assuming debts or loaning credit and substitutes the public purpose test." 7 Proceedings 2010.

Any distinction between the restriction on the expenditure of public funds and the extension of State credit that existed under the 1870 Constitution has thus been abolished by the 1970 Constitution, and the public-purpose test that heretofore satisfied the due process requirement and the 1870 constitutional requirement for the expenditure of public funds will also satisfy the constitutional requirement of article VIII, section 1(a), concerning the use of public credit. Our decision in this case, therefore, depends upon whether or not the use to which the city intends to put the money raised by issuance of the bonds in question is invested with a public purpose. If it is, then there has been no violation of either the due process clause or article VIII, section 1(a), of the Illinois Constitution of 1970.

We might note here the attempt of the mayor to characterize as critical the distinction between general obligation bonds and revenue bonds. The mayor submits that because certain cases have suggested that revenue bonds, unlike general obligation bonds, are not a pledge of the credit of the issuing authority (see, *e.g., People ex rel. City of Salem v. McMackin,* 53 Ill. 2d 347, and *Bowes v. Howlett,* 24 Ill. 2d 545), it follows that cases which have evaluated allegations of public purpose in relation to revenue bonds are not appropriate for consideration herein. We believe this contention to be illogical. The perceived distinction between the two types of bonds would be relevant only if the constitutional restriction against extending credit were separate and distinct from and more extensive than the public-purpose requirements of the due process clause. (See 41 U. Colo. L. Rev. 135, 143.) Article VIII, section 1(a), however, authorizes the expenditure of public funds and credit so long as it is for a public purpose. Our present constitution contains no other specific limitations, and, as noted, it appears from the constitutional debates that no other limitations were intended. At issue in this case, then, is not the existence of a pledge of credit, but rather the nature of the ultimate purpose for which money is spent or credit is pledged or extended. A public purpose insulates the bonds from constitutional attack, whether they be general obligation or revenue bonds.

It is well established that the elimination of a blighted area is itself a public purpose, whether its characterization as blighted results from its physical condition or its unmarketability. (*People ex rel. Gutknecht v. City of Chicago,* 414 Ill. 600.) This is no less true when the purpose of the municipality is the prevention, rather than elimination, of blight which has not yet begun or which, though begun, has not yet reached its apex. (*People ex rel. Gutknecht v. City of Chicago,* 3 Ill. 2d 539.) Furthermore,

this is not altered by the use to which the land will subsequently be put, including nonresidential development (*People ex rel. Adamowski v. Chicago Land Clearance Com.,* 14 Ill. 2d 74), or sale or lease to private interests for redevelopment after acquisition (*People ex rel. Gutknecht v. City of Chicago,* 414 Ill. 600; *Zurn v. Chicago,* 389 Ill. 114).

In the case at bar, of course, we are concerned with commercial redevelopment undertaken to eradicate present blight involving both structural infirmity and economic deterioration, and to forestall its inevitable proliferation; this is clearly within the purview of the above authorities. Assuming that the recommendations of the Rubloff report are followed, the land, once acquired by the city and made ready for development, will be leased to private interests; this, as previously indicated, is also consistent with the public-purpose doctrine. Undeniably, the emphasis of the city's plan is upon the economic revitalization of downtown Urbana rather than the physical removal of substandard structures. In no way, however, does this diminish its public-purpose nature. In *People ex rel. City of Salem v. McMackin,* 53 Ill. 2d 347, we upheld a statute (Ill. Rev. Stat. 1971, ch. 24, par. 11—74—3) whose stated objective was "to reduce conditions of unemployment and the evils attendant thereto, and to encourage the increase of industry within the State." (53 Ill. 2d 347, 354.) We indicated that the fact that the statute provided an impetus to *economic development* satisfied the requirement of public purpose. Similarly, in the case at bar, the city's determination to promote the commercial rebirth of its downtown area is a public purpose satisfying the requirements of article VIII, section 1(a), and the due process clause. In so holding, today's decision denotes that the application of the public-purpose doctrine to sanction urban redevelopment can no longer be restricted to areas where crime, vacancy,

or physical decay produce undesirable living conditions or imperil public health. Stimulation of commercial growth and removal of economic stagnation are also objectives which enhance the public weal. Accord, *Prince George's County v. Collington Crossroads, Inc.* (1975), 275 Md. 171, 339 A.2d 278; *Levin v. Township Committee* (1971), 57 N.J. 506, 274 A.2d 1; *Yonkers Community Development Agency v. Morris* (1975), 37 N.Y.2d 478, 335 N.E.2d 327; *Schenck v. Pittsburgh* (1950), 364 Pa. 31, 70 A.2d 612; *Romeo v. Cranston Redevelopment Agency* (1969), 105 R.I. 651, 254 A.2d 426. Contra, the Florida position expressed in *Baycol, Inc. v. Downtown Development Authority* (Fla. 1975), 315 So. 2d 451, and *Grubstein v. Urban Renewal Agency* (Fla. 1959), 115 So. 2d 745, which require proof that crime and disease infest the area to be redeveloped.

The mayor contends, however, that even though the proposed redevelopment will serve the public health and welfare, it does not fulfill the requirements of public purpose because it is merely a collaboration between the city and a private developer to take property from one individual and give it to another in a scheme "designed to bring financial reward to private developers." We have frequently defined the law on this issue, most recently in *People ex rel. City of Salem v. McMackin*, 53 Ill. 2d 347, 355, 359:

> "We have held on a number of occasions that if the principal purpose and objective in a given enactment is public in nature, it does not matter that there will be an incidental benefit to private interests. (*E.g., People ex rel. Adamowski v. Chicago Railroad Terminal Authority* (1958), 14 Ill. 2d 230, 236; *People ex rel. Gutknecht v. City of Chicago* (1953), 414 Ill. 600, 611, 612; *Poole v. City of Kankakee* (1950), 406 Ill. 521, 530; *Cremer v. Peoria Housing Authority* (1948), 399

Ill. 579, 591-592.)

\* \* \*

> We have indicated that there is no constitutional prohibition against the use of public funds which inure to the benefit of private interests, so long as the money is utilized for a public purpose."

The above is no more than a statement of a widely accepted rule of law. (See, *e.g., Berman v. Parker* (1954), 348 U.S. 26, 33-34, 99 L. Ed. 27, 38, 75 S. Ct. 98, 102-03; *Baycol, Inc. v. Downtown Development Authority* (Fla. 1975), 315 So. 2d 451, 455-56; *State ex rel. Atkinson v. Planned Industrial Expansion Authority* (Mo. 1975), 517 S.W.2d 36, 45; *Levin v. Township Committee* (1971), 57 N.J. 506, 543-45, 274 A.2d 1, 21-22; *Yonkers Community Development Agency v. Morris* (1975), 37 N.Y.2d 478, 482, 335 N.E.2d 327, 331.) It is apparent that the city of Urbana intends to undertake the redevelopment in question primarily for the purpose of revitalizing an economically stagnant downtown area. The purpose of the project is therefore clearly and predominantly a public purpose, and the benefit reaped by private developers is merely an inevitable incident thereto. Consequently, on the basis of *McMackin* and the other authorities cited above, the mayor's objection to the private benefit which will result from the proposed redevelopment is without merit.

The mayor also takes exception to what he calls the city's "proposed continued participation in the project," as indicated by the above-quoted ordinance No. 7374—70. Specifically, the mayor protests the city's power to manage acquired property (granted in paragraph (C) of the ordinance as an alternative to conveyance or other disposition of the property), to borrow funds for the purpose of redevelopment (this is part of the bond-issue provision of paragraph (E)), and to contract to improve acquired property (paragraphs (F) and (G)). The mayor characterizes the potential use of these powers as effecting

a real estate development partnership between the city and private business interests, using public funds. We considered just such an argument in *McMackin*. The legislation at issue in that case granted municipalities, *inter alia*, the power to rent or lease an acquired industrial project (again as an alternative to sale and conveyance), the power to issue bonds to finance needed work on a project, and the power to improve an industrial project. Respondent therein, the mayor of Salem, contended that the statute violated public policy by authorizing a municipality to engage in the real estate business in competition with private enterprise. We found that to be "an unreal analysis of the results under the Act" (53 Ill. 2d 347, 367), and rejected the contention. (See also *Poole v. City of Kankakee,* 406 Ill. 521, 529.) In the present case the identical powers are complained of, and we again reject the contention that their exercise would result in the municipality's participation in private enterprise.

Finally, the mayor alleges that the amount of property the city intends to acquire is more than necessary for the contemplated purpose, and so the taking of this property would be an abuse of the city's eminent domain power. Obviously, that question is not before us at this time. We are, quite simply, only concerned in this case with the refusal of the mayor to execute certain bonds because he doubted the constitutional validity of financing commercial redevelopment through the issuance of general obligation bonds. We are not concerned with an exercise of the power of eminent domain; there has, as yet, been no eminent domain proceeding, and may not be if the city council is able to otherwise acquire the necessary land. The bond ordinance, in fact, which describes the desired parcel, states that the bond issue is needed to finance the *purchase* of the property. Moreover, if indeed the city does exercise its eminent domain power, the issue of the necessity to take a particular quantity of land, as well as other

traditional eminent domain issues, would be properly raised not by the mayor but by the owner of the property to be taken. 29A C.J.S. *Eminent Domain* sec. 95 (1965).

In summary, then, the urban redevelopment planned by the city of Urbana is clearly within the ambit of the public-purpose doctrine. It follows, then, that the powers granted the city council by the relevant ordinances, including the power to issue bonds to finance the program, do not amount to an objectionable loan of credit to private parties. The mayor, therefore, was in error in his refusal to sign the bonds; "the signature of the mayor to these instruments is purely a ministerial act. *Mandamus* is an appropriate form of action under these circumstances." (*People ex rel. City of Salem v. McMackin,* 53 Ill. 2d 347, 353.) We therefore affirm the judgment of the circuit court of Champaign County, which issued a writ of *mandamus* directing the mayor to execute the bonds and the attached interest coupons.

*Judgment affirmed.*