Docket Nos. 104586, 104587, 104590 cons.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

EMPRESS CASINO JOLIET CORPORATION *et al.*, Appellees, v. ALEXI GIANNOULIAS, Treasurer of the State of Illinois, *et al.*, Appellants.

*Opinion filed June 5, 2008.*

JUSTICE BURKE delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Freeman, Fitzgerald, Kilbride, Garman, and Karmeier concurred in the judgment and opinion.

## OPINION

In this case, we are asked to determine the constitutionality of Public Act 94–804 (the Act), which imposed, for a two-year period beginning on the effective date of the amendatory Act, a 3% surcharge on the four riverboat casinos in Illinois that had adjusted gross receipts (AGR) of over $200 million in the calendar year 2004. The remaining five riverboat casinos, all of which had AGRs below $200 million, were not subject to the surcharge. The Act provided that the proceeds of the surcharge were to be distributed to the five horse racing tracks in Illinois. For the reasons that follow, we hold that Public Act 94–804 withstands the constitutional challenges

raised, in the circuit court of Will County, by the four casinos subject to the tax.

## BACKGROUND

The Illinois legislature authorized riverboat casinos in 1990 under the Riverboat Gambling Act (230 ILCS 10/1 *et seq.* (West 2004)). There are 10 licenses available for riverboats in Illinois: nine are in use, the tenth is in litigation. The nine riverboat casinos are located in Alton, Aurora, East Dubuque, East St. Louis, Elgin, Joliet, Metropolis, Peoria, and Rock Island. Four casinos have AGRS over $200 million–Empress Casino Joliet, Harrah's Casino Cruises Joliet, Hollywood Casino-Aurora, and Elgin Riverboat Resort-Riverboat Casino. There are five horse racing tracks with live racing in Illinois, located in Arlington Heights, Crete, Collinsville, Stickney/Cicero, and Melrose Park.

In May 2006, the General Assembly passed Public Act 94–804. The Act requires those casinos with AGRs over $200 million to daily contribute 3% of their AGR into the Horse Racing Equity Trust Fund. The Act provides that the monies (along with interest) shall be distributed, within 10 days of deposit into the Fund, as follows: 60% to organization licensees to be distributed at their race meetings as purses and 40% to racetracks "to improve, maintain, market, and otherwise operate [their] racing facilities to conduct live racing, which shall include backstretch services and capital improvements related to live racing and the backstretch." Distribution of the above-described 40% takes place as follows: 11% to Fairmount Park Racetrack and 89% to the other four tracks pro rata based on the aggregate proportion of total handle[1] for calendar years 2004 and 2005 from wagering on live races conducted in Illinois.

In enacting Public Act 94–804, the legislature made the following findings:

> "(1) That riverboat gaming has had a negative impact on horse racing. From 1992, the first full year of riverboat operations, through 2005, Illinois on-track wagering has deceased by 42% from $835 million to $482 million.

---

[1]The "handle" is the amount of money wagered in the pari-mutuel pool or the total amount of bets taken.

(2) That this decrease in wagering has negatively impacted purses for Illinois racing, which has hurt the State's breeding industry. Between 1991 and 2004 the number of foals registered with the Department of Agriculture has decreased by more th[a]n 46% from 3,529 to 1,891.

(3) That the decline of the Illinois horseracing and breeding program, a $2.5 billion industry, would be reversed if this amendatory Act of the 94th General Assembly was enacted. By requiring that riverboats agree to pay 3% of their gross revenue into the Horse Racing Equity Trust Fund, total purses in the State may increase by 50%, helping Illinois tracks to better compete with those in other states. Illinois currently ranks thirteenth nationally in terms of its purse size; the change would propel the State to second or third.

(4) That Illinois agriculture and other businesses that support and supply the horse racing industry, already a sector that employs over 37,000 Illinoisans, also stand to substantially benefit and would be much more likely to create additional jobs should Illinois horse racing once again become competitive with other states.

(5) That the 3% of gross revenues this amendatory Act of the 94th General Assembly will contribute to the horse racing industry will benefit that important industry for Illinois farmers, breeders, and fans of horseracing and will begin to address the negative impact riverboat gaming has had on Illinois horseracing." Pub. Act 94–804, §1, eff. May 26, 2006.

Plaintiffs, Empress Casino Joliet Corporation, Des Plaines Development Limited Partnership d/b/a Harrah's Casino Cruises Joliet, Hollywood Casino-Aurora, Inc., and Elgin Riverboat Resort-Riverboat Casino d/b/a Grand Victoria Casino, filed a four-count complaint for declaratory judgment and injunctive relief against defendants, Alexi Giannoulias as the Treasurer of the State of Illinois[2] and the Illinois Racing Board.

---

[2]Judy Barr Topinka was originally named. Giannoulias was substituted as defendant when he took office.

In count I, plaintiffs alleged that the Act violates the takings clause (article I, section 15) and the due process clause (article I, section 2) of the Illinois Constitution, as well as the due process clause of the United States Constitution, because the surcharge is used for a primarily private use. In count II, plaintiffs alleged that the Act violates article VIII, section 1 (the so-called public funds clause), of the Illinois Constitution because the surcharge was imposed for a private purpose only. In count III, plaintiffs alleged that the Act violates the uniformity clause (article IX, section 2) of the Illinois Constitution as well as the equal protection clauses of the Illinois and federal constitutions. Lastly, in count IV, plaintiffs alleged that the Act violates the special legislation provision (article IV, section 13) of the Illinois Constitution because the surcharge confers a benefit on a particular private group without a reasonable basis, rather than promoting the general welfare of the state. Plaintiffs sought a declaration that the Act is unconstitutional and a permanent injunction against the imposition or collection of the surcharge. Plaintiffs have paid the surcharge under protest pursuant to the State Officers and Employees Money Disposition Act (30 ILCS 230/2a (West 2006)).

Balmoral Park Racing Club, Inc., Hawthorne Race Course, Inc., Maywood Park Trotting Association, the National Jockey Club, and the Illinois Harness Horsemen's Association were granted leave to intervene on behalf of defendants.

The parties eventually filed cross-motions for summary judgment. The circuit court granted summary judgment in favor of plaintiffs, holding that the Act is invalid because it violates the uniformity clause of the Illinois Constitution. The circuit court found there was no real and substantial difference between the four casinos taxed and the five casinos not taxed and that no reasonable relationship had been provided for the classification. In so finding, the circuit court rejected defendants' contention that the classification for the taxed casinos was reasonable since those casinos making over $200 million AGR were better able to absorb the surcharge. The court found that the ability-to-absorb justification was insufficient.

Because the circuit court invalidated an Illinois statute, defendants and intervenors appeal directly to this court. See 210 Ill. 2d R. 302(a)(1).

-4-

ANALYSIS

Summary judgment is proper where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2–1005(c) (West 2000). We review the circuit court's grant of summary judgment *de novo. Arangold Corp. v. Zehnder*, 204 Ill. 2d 142, 146 (2003).

We also review the constitutionality of a statute *de novo. Arangold Corp.*, 204 Ill. 2d at 146. "Statutes bear a presumption of constitutionality, and broad latitude is afforded to legislative classifications for taxing purposes." *Allegro Services, Ltd. v. Metropolitan Pier & Exposition Authority*, 172 Ill. 2d 243, 250 (1996). The party challenging a nonproperty tax classification carries the burden of rebutting that presumption and "clearly establishing" the Act's unconstitutionality by showing that it "is arbitrary or unreasonable." *Allegro Services, Ltd.*, 172 Ill. 2d at 250-51. We have a duty to uphold a statute as constitutional whenever reasonably possible. *Arangold Corp.*, 204 Ill. 2d at 146.

I. Uniformity Challenge
A. *Standards for a Uniformity Challenge*

Article IX, section 2, of the Illinois Constitution provides:

> "In any law classifying the subjects or objects of non-property taxes or fees, the classes shall be reasonable and the subjects and objects within each class shall be taxed uniformly. Exemptions, deductions, credits, refunds and other allowances shall be reasonable." Ill. Const. 1970, art. IX, §2.

The standards for evaluating a challenge to a statute based on the uniformity clause are well established:

> "To survive scrutiny under the uniformity clause, a nonproperty tax classification must (1) be based on a real and substantial difference between the people taxed and those not taxed, and (2) bear some reasonable relationship to the object

-5-

of the legislation or to public policy." *Arangold Corp.*, 204 Ill. 2d at 153.

Relying on language from this court's decision in *Arangold Corp.*, plaintiffs initially contend that, to satisfy the second prong of the uniformity test, the tax (1) must be designed to remedy a special burden the class in question has imposed on the state or (2) must confer a specific benefit on the class taxed.

In *Arangold Corp.*, wholesale distributors of cigars and chewing tobacco challenged a tax on their products to fund long-term care for skilled and intermediate nursing facilities, particularly for those unable to afford the cost of such care, as a violation of due process and the uniformity clause. We rejected both challenges. With respect to the uniformity challenge, we concluded that the plaintiffs failed to satisfy their burden to show that the asserted justification for the classification was unsupported by the facts. *Arangold Corp.*, 204 Ill. 2d at 157.

Plaintiffs maintain that, while the tax was found reasonable in *Arangold Corp.*, we must reach an opposite result here. Plaintiffs argue that the critical difference between the instant case and *Arangold Corp.* is that the General Assembly here could not rationally believe the "responsibility to pay" for subsidizing the horse racing industry "rests with the State." Moreover, plaintiffs contend that whatever harm the casinos have caused to the horse racing industry, it cannot possibly be deemed a burden imposed by the casinos on the state since the state has no responsibility to support the horse racing industry.

Plaintiffs' contention that the tax levied against them must be designed to remedy a special burden the casinos imposed on the state in order for the classification to bear a reasonable relationship to the statute is incorrect. Plaintiffs take comments this court made in *Arangold Corp.* in connection with our due process discussion and attempt to interject them into the uniformity analysis. In *Arangold Corp.*, when discussing the second prong of a due process challenge, *i.e.*, whether the statute bears a reasonable relationship to the interest intended to be protected, we noted that the General Assembly could have believed the responsibility to assist the poor with long-term care rests with the state, that persons often need long-term care due to their use of tobacco products, and thus, distributors of tobacco products

-6-

should bear some measure of the costs through taxation. From this comment, plaintiffs attempt to engraft onto the second prong of the uniformity analysis a requirement that the tax must be designed to remedy some burden the taxed class has imposed on the state in order to satisfy that prong. We reject this argument.

When discussing the plaintiffs' challenge under the uniformity clause in *Arangold Corp.*, this court never held that, in order to bear a reasonable relationship to the object of the legislation, the tax must be designed to remedy some burden the taxed class imposed on the state. The language in *Arangold Corp.* on which plaintiffs rely was never part of the standard for assessing a uniformity challenge. Rather, it was one factor we considered when, in relation to the plaintiffs' due process challenge, we determined whether the statute at issue in *Arangold Corp.* bore a reasonable relationship to the interest sought to be protected. Accordingly, we find no support for plaintiffs' claims that a tax will violate the uniformity clause unless it is designed to remedy a special burden of the state.

Plaintiffs' alternative argument is that the tax at issue here may be upheld only if the casinos stand to benefit from the tax in some special way. Because it is undisputed the casinos will not benefit from the subsidy, plaintiffs maintain the surcharge is not reasonably related to the purpose of the legislation. We are unpersuaded by this argument.

We have repeatedly held that a tax may be imposed upon a class even though the class enjoys no benefit from the tax. See, *e.g.*, *Arangold Corp.*, 204 Ill. 2d at 151 (" '[n]othing is more familiar in taxation than the imposition of a tax upon a class or upon individuals who enjoy no direct benefit from its expenditure, and who are not responsible for the condition to be remedied' "), quoting *Carmichael v. Southern Coal & Coke Co.*, 301 U.S. 495, 521-22, 81 L. Ed. 1245, 1260, 57 S. Ct. 868, 878 (1937). Accordingly, we reject plaintiffs' attempts to alter the standards for analyzing uniformity clause challenges. We reiterate: "To survive scrutiny under the uniformity clause, a nonproperty tax classification must (1) be based on a real and substantial difference between the people taxed and those not taxed, and (2) bear some reasonable relationship to the object of the legislation or to public policy." *Arangold Corp.*, 204 Ill. 2d at 153.

In relation to the first prong–whether a real and substantial difference exists between those taxed and those not taxed–it has been recognized that "[t]he party attacking a tax classification is not required to negate every conceivable basis that might support it." *Arangold Corp.*, 204 Ill. 2d at 153. Rather, once the plaintiff establishes a good-faith uniformity challenge, the taxing body must produce a justification for the classification. *Geja's Cafe v. Metropolitan Pier & Exposition Authority*, 153 Ill. 2d 239, 248 (1992). It then becomes the plaintiff's burden to persuade the court that the justification is insufficient, either as a matter of law or as unsupported by the facts. *Geja's Cafe*, 153 Ill. 2d at 248-29. If the plaintiff cannot do so, then, as a matter of law, judgment is proper for the taxing body. *Geja's Cafe*, 153 Ill. 2d at 249.

We further explained the nature of the uniformity clause in *Arangold Corp.*:

> "The uniformity clause was intended to be a broader limitation on legislative power to classify for nonproperty tax purposes than the limitation of the equal protection clause (*Searle Pharmaceuticals, Inc. v. Department of Revenue*, 117 Ill. 2d 454, 469 (1987)) and was meant to insure that taxpayers would receive added protection in the state constitution based upon a standard of reasonableness that is more rigorous than that contained in the federal constitution (*Milwaukee Safeguard*, 179 Ill. 2d at 102). \*\*\* Despite the more stringent standard under the uniformity clause, the scope of a court's inquiry is 'relatively narrow.' *Allegro*, 172 Ill. 2d at 250. '[I]n a uniformity clause challenge the court is not required to have proof of perfect rationality as to each and every taxpayer. The uniformity clause was not designed as a straitjacket for the General Assembly. Rather, the uniformity clause was designed to enforce minimum standards of reasonableness and fairness as between groups of taxpayers.' *Geja's Cafe*, 153 Ill. 2d at 252." *Arangold Corp.*, 204 Ill. 2d at 153.

When a plaintiff challenges a legislative classification, he has the burden of showing the classification is arbitrary or unreasonable. *Geja's Cafe*, 153 Ill. 2d at 248. If a set of facts "can be reasonably

conceived that would sustain it, the classification must be upheld." *Geja's Cafe*, 153 Ill. 2d at 248.

In the case at bar, the parties do not dispute that the Act creates two classifications: (1) all casinos and (2) casinos with an AGR over $200 million. The question before us is whether these two classifications are arbitrary or unreasonable. The circuit court found only that the AGR classification violated the uniformity clause. However, plaintiffs argue to this court that the classification relating to the casinos as a whole is also invalid. We address this classification first, because if that classification fails, the AGR classification would necessarily fail as well.

## B. *Casinos Classification*

Plaintiffs contend that the Act violates the uniformity clause because the General Assembly's stated reason for singling out casinos for taxation, *i.e.*, repairing damage to the horse racing industry, fails the rational basis test applied under uniformity clause analysis.

Defendants and intervenors, however, claim that the classification is reasonable and not arbitrary. They note that the object of the legislation at issue here was to reverse the decline in the horse racing industry. The legislature's justification for the surcharge, as expressly set forth by the General Assembly in the Act, was that the casinos have had a negative impact on that industry.

Since a justification has been produced, it is incumbent upon plaintiffs to establish that the justification is insufficient as a matter of law or that it is unsupported by the facts. In their attempt to do so, plaintiffs offer a report entitled "A Review of Racing in Illinois with a Comparison to National Trends in Pari-mutuel Wagering," compiled by Eugene Christiansen of Christiansen Capital Advisors, a company that performs studies of the economic, management, operation, taxation and regulation of leisure and entertainment businesses in the United States and abroad. The report purports to provide "trends in Illinois horse race wagering between 1983 and 2004, together with comparison of trends in Illinois horse racing with contemporary trends in horse racing in the United States as a whole; in States with horse racing but no casinos; and in States with horse racing and casinos."

Christiansen concludes in this report:

> "These trends and comparisons do not support the statement that Illinois riverboat casinos were the sole, or even the main, factor in the decrease of wagering at racetracks in Illinois. *** The decline in wagering at Illinois racetracks is principally due to off-track betting, which shifted a large amount of wagers from racetracks to OTB facilities, while increasing total State-wide wagering on horse races."

Further, Christiansen opines:

> "[L]icensed interactive betting services, unlicensed interactive betting services located in other countries, and interactive betting services licensed in other countries that accept bets from U.S. residents also contribute to the decline in live handle by shifting wagers from live and simulcast pari-mutuel facilities to personal computers and interactive television. Simulcasting, off-track betting and Internet and other interactive bettor services including telephone account wagering were developments internal to the horseracing industry. They were not consequences of casino gaming, in Illinois or in the United States."

In the case at bar, the legislature has provided express findings regarding the necessity of the tax imposed on the casinos. The general rule regarding such findings has been explained:

> "Courts are not empowered to 'adjudicate' the accuracy of legislative findings. The legislative fact-finding authority is broad and should be accorded great deference by the judiciary. Therefore, to the extent the affidavits of record may have been offered to contest the wisdom of the legislative enactment, we reiterate that the legislature is not required to convince this court of the correctness of its judgment ***. See *Bernier*, 113 Ill. 2d at 229, citing *Vance v. Bradley*, 440 U.S. 93, 111, 59 L. Ed. 2d 171, 184-85, 99 S. Ct. 939, 949-50 (1979); see also *Cutinello v. Whitley*, 161 Ill. 2d 409 (1994). Our task is limited to determining whether the challenged legislation is constitutional, and not whether it is wise." *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 389-90 (1997).

-10-

While it is clear that Christiansen holds a view different from that of the legislature as to the cause of the decline in the horse racing industry, that view does not render the legislative findings insufficient. Simply because Christiansen's report suggests that casinos are not the *sole* reason for the decline of horse racing does not mean that plaintiffs have satisfied their burden of establishing that the justification for the classification is arbitrary or unreasonable. Giving the legislative findings the deference they must be accorded (see *Best*, 179 Ill. 2d at 389-90), we conclude there is a reasonable relationship between the classification and object of the legislation.

## C. *AGR Classification*

As previously noted, the circuit court in the case at bar held there was no real and substantial difference between the four casinos taxed and the five that were not and, as a result, there was no reasonable relationship between the AGR classification and the object of the Act. Before this court, plaintiffs ask us to uphold this finding.

Defendants and intervenors, however, contend that the casinos with an AGR over $200 million can better absorb the surcharge and that this is a proper basis for distinguishing the casinos. Defendants and intervenors maintain that the circuit court's decision must be reversed because plaintiffs failed to meet their burden of demonstrating that this justification for the AGR classification is insufficient as a matter of law or unsupported by the facts.

Initially we note that one reason the circuit court ruled as it did was because it held that the General Assembly did not set forth its justification for the AGR classification within the Act itself. Defendants and intervenors contend that this was error on the circuit court's part. We agree.

Although none of the cases cited by the parties directly analyze this question, it is evident from case law that the legislature is not required to state its justification for a classification within an act. As this court has stated: "The reasons justifying the classification, moreover, need not appear on the face of the statute, and the classification must be upheld if any state of facts reasonably can be conceived that would sustain it." *Department of Revenue v. Warren Petroleum Corp.*, 2 Ill. 2d 483, 490 (1954). We conclude, therefore,

-11-

that the legislature is not required to provide its justification for a classification within the statute itself. The circuit court's holding to the contrary was in error.

On a related issue, plaintiffs argue that the "ability to absorb" justification fails because it is at odds with the expressly stated purpose of the Act, which is to address the harm created by casinos to horse track racing. Plaintiffs maintain that, when the legislature states its purpose within an act, a classification cannot later be upheld on other grounds. In support of this argument, plaintiffs rely on *Primeco Personal Communications, L.P. v. Illinois Commerce Comm'n*, 196 Ill. 2d 70 (2001).

In *Primeco*, a municipal infrastructure maintenance fee was imposed by certain municipalities on telecommunications retailers. The plaintiffs were wireless telecommunications retailers who argued that the fee violated the uniformity clause because the fee was intended as a means of compensating municipalities for the physical occupation of the public right-of-way by telecommunication providers. Because the plaintiffs, being wireless, did not physically occupy any public right-of-way, they argued that they should not be subject to the fee. *Primeco*, 196 Ill. 2d at 73. The defendants denied that the fee was a means of compensating municipalities for their occupation of the public right-of-way and instead argued that the fee was a means of raising revenue. The circuit court found that the object of the fee was to compensate municipalities for use of the right-of-way. Because the wireless retailers did not use these right-of-ways, the court held the classification as applied to plaintiffs was unreasonable. *Primeco*, 196 Ill. 2d at 82. We affirmed the circuit court and held there was no reasonable relationship between the classification and the object of the legislation.

Plaintiffs maintain that *Primeco* "held that when the General Assembly expressly sets forth the purpose of a tax, the taxing body cannot defend against a uniformity challenge by offering a different rationale." However, this language appears nowhere in *Primeco*, nor can it be implied from other language in the opinion. *Primeco* simply does not so hold.

We find *Primeco* distinguishable for another reason. The defendants in *Primeco* were attempting to define the *purpose* of the act itself, not the justification for a classification. In the case at bar,

-12-

defendants and intervenors do not assert, as plaintiffs maintain, that the *purpose* for imposing the surcharge was based on the ability to absorb. Instead, they assert that the *AGR classification* is based on the ability to absorb the costs.

Defendants have produced a justification for the classification, *i.e.*, the ability to absorb the surcharge, which the General Assembly could reasonably have concluded was a rational justification. It is therefore incumbent upon plaintiffs to show that the justification is insufficient as a matter of law or unsupported by the facts. Plaintiffs contend that the defendants' justification fails because it is not supported by the facts. Plaintiffs maintain that, if the General Assembly was concerned about a casino's ability to absorb the cost, it would have set the measuring point of the casinos' financial condition at the time the surcharge was paid, rather than the 2004 AGR. Plaintiffs assert that this retrospective view suggests the $200 million limit was arbitrarily selected to insulate the downstate casinos from the tax and was not a point at which a casino could afford to absorb the surcharge. Plaintiffs further argue that the $200 million AGR was selected by the legislature because it allowed the downstate casinos to be exempt from the tax and that exempting the downstate casinos from the tax was the only way the legislature was able to get the Act passed.

We are unpersuaded by plaintiffs' arguments. First, plaintiffs have not shown that there is no real and substantial difference between the downstate casinos and the upstate casinos, which are the ones that have AGRs over $200 million. The fact is, however, that the downstate casinos' average intake is between $2 and $6 million per month, while the upstate casinos, located in more populated areas, have an average intake of $20 to $40 million per month. This is a substantial difference.

Moreover, plaintiffs' suggestion that a different method for determining the financial condition of the casinos for deciding whether to impose the surcharge is impractical. It would be inconceivable to measure the financial condition of the casinos at the time they were required to pay the surcharge. The Act requires the surcharge to be levied on a daily basis. It would be logistically impossible to measure the financial condition of each casino every single day. The legislature had to set some measuring point. Since the

-13-

bill was introduced in 2005, the 2004 figures were the most recent financial figures and, thus, a logical choice to use as the measuring point.

Further, plaintiffs' suggestion that setting the measuring stick at $200 million was the result of a legislative compromise is not a relevant consideration. The justification itself is the critical focus. If the justification is reasonable, any further inquiry into the motives of the legislature is improper. *Donovan v. Holzman*, 8 Ill. 2d 87, 96 (1956) (court is not at liberty to inquire into the motives of the legislature). Plaintiffs' arguments fail to persuade us that the justification for the AGR classification is not supported by the facts.

Plaintiffs further argue that mere quantitative differences in AGR between otherwise identical businesses should never be enough, alone, to justify an exemption from a fee. Plaintiffs maintain that a qualitative difference must exist between the five casinos below the $200 million threshold and the four above it, and that none exists here, because all casinos have the similar ability to incorporate the cost of the surcharge into the services they provide.

Initially, we do not accept plaintiffs' premise that all casinos are identical. While it may be true that all casinos might be able to incorporate a surcharge into their services and pass the charge along to customers, this does not mean the casinos are identical.

More fundamentally, however, we agree with defendants that the uniformity clause allows subclassifications and exclusions as long as they are reasonable. As such, quantitative differences in AGR may be sufficient to justify a classification. We have previously held that there need not be "proof of perfect rationality as to each and every taxpayer." *Arangold Corp.*, 204 Ill. 2d at 153.

We conclude that plaintiffs have failed to meet their burden of demonstrating there is no real and substantial difference between the two groups of casinos. Plaintiffs have not shown the classification is arbitrary or unreasonable. Accordingly, we conclude that the circuit court erred in holding that the Act violates the uniformity clause of the Illinois Constitution.

II. Public Use and Public Purpose

-14-

In an alternative argument in support of the circuit court's judgment, plaintiffs claim that the Act is unconstitutional because the subsidy to the horse racing tracks primarily benefits private parties and not the public. In making this argument, plaintiffs rely on the takings clause of the federal constitution and article VIII, section 1, of the Illinois Constitution.

The federal takings clause provides: "nor shall private property be taken for public use, without just compensation." U.S. Const., amend. V. This provision is made applicable to the states through the fourteenth amendment (U.S. Const., amend. XIV). *Southwestern Illinois Development Authority v. National City Environmental, L.L.C.*, 199 Ill. 2d 225, 235 (2002). Article I, section 15, of the Illinois Constitution, the Illinois takings clause, provides: "Private property shall not be taken or damaged for public use without just compensation as provided by law." Ill. Const. 1970, art. I, §15.

Plaintiffs maintain that the surcharge should be deemed a taking because it is not characterized in the Act as a tax, but a license fee, because it does not have the fundamental characteristic of a tax in that it does not support government or government programs and because it is imposed as a condition of the casinos' continuation of a valuable property right–their licenses. Plaintiffs argue that a takings analysis should apply whenever the government takes property, whether real or monetary, from one party and gives it to another and that there is a need for heightened scrutiny to ensure a public purpose is being served.

We reject plaintiffs' assertion that a takings analysis applies here. It is well settled that the takings clauses of the federal and state constitutions apply only to the state's exercise of eminent domain and not to the state's power of taxation. See *County of Mobile v. Kimball*, 102 U.S. 691, 703, 26 L. Ed. 238, 241 (1880) ("But neither is taxation for a public purpose, however great, the taking of private property for public use, in the sense of the Constitution"). The West Virginia Supreme Court has aptly stated this rule:

> "Courts universally have concluded that the takings clauses of the various state and federal constitutions do not apply in the context of taxing statutes, because the power to tax is a separate constitutional power from the power to take property by eminent domain. Case law from the United States

-15-

> Supreme Court and federal and state courts throughout the country makes clear that the constitutional takings clause is not a limitation upon the taxing power conferred upon legislatures by their respective constitutions. See *Brushaber v. Union Pacific Railroad Co.*, 240 U.S. 1, 24, 36 S. Ct. 236, 244, 60 L. Ed. 493, 504 (1916) (the Due Process Clause of the Fifth Amendment 'is not a limitation upon the taxing power conferred upon Congress by the Constitution'); *Branch v. U.S.,* 69 F.3d 1571, 1576 (Fed. Cir. 1995) ('[E]ven though taxes ... indisputably "take" money from individuals or businesses, assessments of that kind are not treated as *per se* takings'); *A. Magnano v. Hamilton,* 292 U.S. 40, 54 S.Ct. 599, 78 L.Ed. 1109 (1934) (taxing power of state or federal government not considered a taking under the Fifth or Fourteenth Amendment) \*\*\*." *In re Estate of Lewis*, 217 W. Va. 48, 58, 614 S.E.2d 695, 705 (2005).

See also *Gilman v. City of Sheboygan*, 67 U.S. (2 Black) 510, 17 L. Ed. 305 (1862). See generally 71 Am. Jur. 2d *State & Local Taxation* §61, at 351 (2001) (the takings clause is "appl[icable] to the power of eminent domain, but not to the power of taxation").

The same principle applies to fees, whether for certain services or licensing. In *Mlade v. Finley*, 112 Ill. App. 3d 914 (1983), the plaintiffs challenged certain circuit court filing fees as a violation of, *inter alia*, the takings clause. *Mlade*, 112 Ill. App. 3d at 916. The appellate court rejected the plaintiffs' argument "because the 'just compensation' [takings clause] provisions (Ill. Const. 1970, art. I, sec. 15; U.S. Const., amends. V and XIV, sec. 1) apply only to exercises of the power of eminent domain, not to applications of the authority to raise revenue for public purposes. See *Zelney v. Murphy* (1944), 387 Ill. 492." *Mlade*, 112 Ill. App. 3d at 924. See also *Alaska Fish Salting & By-Products Co. v. Smith*, 255 U.S. 44, 65 L. Ed. 489, 41 S. Ct. 219 (1921). Numerous other cases have held the same. See, *e.g.*, *Laredo Road Co. v. Maverick County, Texas*, 389 F. Supp. 2d 729 (W.D. Tex. 2005); *2284 Corporation v. Shiffrin*, 98 F. Supp. 2d 244 (D. Conn. 2000); *San Remo Hotel L.P. v. City & County of San Francisco*, 27 Cal. 4th 643, 41 P.3d 87, 117 Cal. Rptr. 2d 269 (2002); *Rinn v. Bedford*, 102 Colo. 475, 84 P.2d 827 (1938); *City of Thomson v. Davis*, 92 Ga. App. 216, 88 S.E.2d 300 (1955); *BHA Investments,*

*Inc. v. State*, 138 Idaho 348, 63 P.3d 474 (2003); *Jordan v. City of Evansville*, 163 Ind. 512, 72 N.E. 544 (1904); *Bobbie Preece Facility v. Commonwealth of Kentucky, Department of Charitable Gaming*, 71 S.W.3d 99 (Ky. App. 2001); *Board of Trustees of Falmouth v. Watson*, 68 Ky. 660 (1869); *State ex rel. Interstate Air-Parts, Inc. v. Minneapolis-St. Paul Metropolitan Airports Comm'n*, 223 Minn. 175, 25 N.W.2d 718 (1947); *Rogers v. Hennepin County*, 124 Minn. 539, 145 N.W. 112 (1914); *President Riverboat Casino-Missouri, Inc. v. Missouri Gaming Comm'n*, 13 S.W.3d 635 (Mo. 2000); *Dunn v. Mayor & Council of City of Hoboken*, 88 A. 1053 (N.J. Sup. 1913); *Kisslinger's Appeal*, 59 Pa. D. & C. 126 (1947); *Smith v. Cortes*, 879 A.2d 382 (Pa. Commw. 2005); *Lamb v. Whitaker*, 171 Tenn. 485, 105 S.W.2d 105 (1937).

Ignoring this wealth of law, plaintiffs point to *Northern Illinois Home Builders Ass'n v. County of Du Page*, 165 Ill. 2d 25 (1995), where this court applied a takings analysis to a municipality's imposition of transportation impact fees. In *Northern Illinois Home Builders Ass'n*, a fee was imposed in connection with land. Specifically, a fee was imposed on persons constructing new housing developments to fund road improvements made necessary in light of the expected traffic growth from the development. *Northern Illinois Home Builders Ass'n*, 165 Ill. 2d at 30. The fee at issue in *Northern Illinois Home Builders Ass'n* was inextricably tied to real property and, thus, a takings analysis was appropriate.

The same is not true here. The 3% surcharge is in no way tied to real property. As such, *Northern Illinois Home Builders Ass'n* does not support plaintiffs' claim that a takings analysis is applicable here.

Plaintiffs also cite to *Eastern Enterprises v. Apfel*, 524 U.S. 498, 141 L. Ed. 2d 451, 118 S. Ct. 2131 (1998) (plurality op.), to support their argument that a takings analysis may be applied to a monetary obligation. However, we find plaintiffs' reliance on *Apfel* misplaced.

In *Apfel*, a plurality of Justices (Chief Justice Rehnquist, and Justices O'Connor, Scalia and Thomas) applied a takings analysis to a monetary obligation, but a majority of the Justices rejected the theory that an obligation to pay money constitutes a taking. Justice Kennedy, in his separate opinion explained:

"Our cases do not support the plurality's conclusion that the Coal Act takes property. The Coal Act imposes a staggering financial burden on the petitioner, Eastern Enterprises, but it regulates the former mine owner without regard to property. It does not operate upon or alter an identified property interest, and it is not applicable to or measured by a property interest. The Coal Act does not appropriate, transfer, or encumber an estate in land (*e.g.*, a lien on a particular piece of property), a valuable interest in an intangible (*e.g.*, intellectual property), or even a bank account or accrued interest. The law simply imposes an obligation to perform an act, the payment of benefits. The statute is indifferent as to how the regulated entity elects to comply or the property it uses to do so. To the extent it affects property interests, it does so in a manner similar to many laws; but until today, none were thought to constitute takings. To call this sort of governmental action a taking as a matter of constitutional interpretation is both imprecise and, with all due respect, unwise." *Apfel*, 524 U.S. at 540, 141 L. Ed. 2d at 481, 118 S. Ct. at 2154 (Kennedy, J., concurring in judgment and dissenting in part).

Justices Stevens, Souter, Ginsburg, and Breyer agreed with Justice Kennedy that the takings clause was not implicated, finding that "at the heart of the [Takings] Clause lies a concern, not with preventing arbitrary or unfair government action, but with providing *compensation* for legitimate government action that takes 'private property' to serve the 'public' good." (Emphasis in original.) *Apfel*, 524 U.S. at 554, 141 L. Ed. 2d at 490, 118 S. Ct. at 2161 (Breyer, J., dissenting, joined by Stevens, Souter and Ginsburg, JJ.). It was noted that: "The 'private property' upon which the Clause traditionally has focused is a specific interest in physical or intellectual property. [Citations.] *** This case involves not an interest in physical or intellectual property, but an ordinary liability to pay money ***." *Apfel*, 524 U.S. at 554, 141 L. Ed. 2d at 490-91, 118 S. Ct. at 2161-62 (Breyer, J., dissenting, joined by Stevens, Souter and Ginsburg, JJ.). Observing that "application of the Takings Clause here bristles with conceptual difficulties," Justice Breyer noted that the plurality's analysis would seemingly be applicable to ordinary taxes and other

-18-

statutes and rules that routinely create financial burdens for some that benefit others. *Apfel*, 524 U.S. at 556, 141 L. Ed. 2d at 491-92, 118 S. Ct. at 2162-63 (Breyer, J., dissenting, joined by Stevens, Souter and Ginsburg, JJ.). Thus, five Justices of the Supreme Court in *Apfel* reaffirmed the traditional rule that regulatory actions requiring the payment of money are not takings.

In light of the foregoing, we conclude that the surcharge at issue here is not subject to a takings challenge. The Act does not involve an interest in physical or intellectual property, nor does it operate upon or alter an identifiable property interest. The case at bar does not involve the state's exercise of its eminent domain powers, but rather involves its exercise of its taxing powers. We conclude that the surcharge is not a taking of private property within the meaning of the constitutional takings clauses. As such, a takings analysis is not applicable to plaintiffs' claim.

We now turn to plaintiffs' challenge that the surcharge violates article VIII, section 1, of the Illinois Constitution (the public funds clause).

Article VIII, section 1, of the Illinois Constitution of 1970 provides that "[p]ublic funds, property or credit shall be used only for public purposes." Ill. Const. 1970, art. VIII, §1. "[I]n order to proceed under article VIII, section 1(a) of the Illinois Constitution, facts must be alleged indicating that governmental action has been taken which directly benefits a private interest without a corresponding public benefit ***." *Paschen v. Village of Winnetka*, 73 Ill. App. 3d 1023, 1028-29 (1979). In *Friends of the Parks*, we reiterated the well-settled principles regarding a public purpose:

> " 'This court has long recognized that what is for the public good and what are public purposes are questions which the legislature must in the first instance decide. [Citations.] In making this determination, the legislature is vested with a broad discretion, and the judgment of the legislature is to be accepted in the absence of a clear showing that the purported public purpose is but an evasion and that the purpose is, in fact, private. [Citations.] In the words of Justice Holmes, "a declaration by a legislature concerning public conditions that by necessity and duty it must know, is entitled at least to great respect." [Citation.]' " *Friends of the Parks v. Chicago Park*

*District*, 203 Ill. 2d 312, 320 (2003), quoting *In re Marriage of Lappe*, 176 Ill. 2d 414, 429-30 (1997).

We have further expressed:

> "What is a 'public purpose' is not a static concept, but is flexible and capable of expansion to meet the changing conditions of a complex society. [Citations.] Moreover, ' "[t]he power of the State to expend public moneys for public purposes is not to be limited, alone, to the narrow lines of necessity, but the principles of wise statesmanship demand that those things which subserve the general wellbeing of society and the happiness and prosperity of the people shall meet the consideration of the legislative body of the State, though they ofttimes call for the expenditure of public money." ' [Citation.] The consensus of modern legislative and judicial thinking is to broaden the scope of activities which may be classified as involving a public purpose. [Citations.]" *In re Marriage of Lappe*, 176 Ill. 2d at 430-31, quoted by *Friends of the Parks*, 203 Ill. 2d at 320-21.

See also *People ex rel. City of Urbana v. Paley*, 68 Ill. 2d 62, 75, 76 (1977) (" '[w]e have held on a number of occasions that if the principal purpose and objective in a given enactment is public in nature, it does not matter that there will be an incidental benefit to private interests.' " and " '[w]e have indicated that there is no constitutional prohibition against the use of public funds which inure to the benefit of private interests, so long as the money is utilized for a public purpose' "), quoting *People ex rel. City of Salem v. McMackin*, 53 Ill. 2d 347, 355-59 (1972) (observing that the courts of Illinois have adopted an expanding concept of "public purpose" where economic welfare is involved and that we have upheld legislation that has "economically benefited private interests, but has been motivated by, and served, a more compelling public interest").

In deciding whether a purpose is public or private, courts are

> " 'largely influenced by the course and usage of the government, the object for which taxes and appropriations have been customarily and by long course of legislation levied and made, and what objects have been considered necessary to the support and for the proper use of the government.

> Whatever lawfully pertains to this purpose and is sanctioned by time and the acquiescence of the people may well be said to be a public purpose and proper for the maintenance of good government.' *Hagler* [*v. Small*], 307 Ill. [460,] 474 [(1923)]."
>
> *In re Marriage of Lappe*, 176 Ill. 2d at 430.

See also *In re Marriage of Lappe*, 176 Ill. 2d at 437 ("If the principal purpose of the enactment is public in nature, it is irrelevant that there will be an incidental benefit to private interests"). If the purpose sought to be achieved by the legislation is a public one and it contains elements of public benefit, then the question of how much benefit the public derives is for the legislature, not the courts. *McMackin*, 53 Ill. 2d at 357-58.

Plaintiffs contend that, from the face of the Act, the primary intended beneficiaries are private parties and, thus, the Act fails the public-purpose test. The standards established above require us to defer to the legislative findings announced in the Act unless plaintiffs have made a showing that the findings are evasive and that the purpose of the legislation is principally to benefit private interests.

Plaintiffs have not shown that the legislative findings, as stated in the Act, are evasive or deceptive. Thus, our inquiry turns on whether the surcharge created by the Act serves a public purpose.

Plaintiffs argue that the primary intended beneficiary of the surcharge are private parties, the track owners, and not the public. First, plaintiffs maintain that, because all of the proceeds of the surcharge are turned over to the track owners, this demonstrates the intended beneficiary is private. In a related argument, plaintiffs maintain that, because there is no effective control on how the track owners can use the 40% of the surcharge given to them, this demonstrates the intended beneficiary was private.

The plain language of the Act belies this argument. While it may be true the proceeds go directly to the track owners, the manner in which the owners must utilize the funds is controlled by statute. The Act specifically states how the money must be used: 60% goes to the tracks as purses and 40% goes to the tracks "to improve, maintain, market, and otherwise operate [their] racing facilities to conduct live racing, which shall include backstretch services and capital improvements related to live racing and the backstretch." The track

owners cannot simply pocket any of the funds they receive, not even the 40%. The 40% is earmarked for specific purposes and must be used by the tracks for those purposes.

Plaintiffs also maintain that the benefits are conferred on the tracks without regard to need. We disagree. The legislature could reasonably have concluded that the total handle of a track related to how much of a benefit to the economy that track could achieve. Stated differently, the legislature could have believed that the tracks with the larger handles would be able to contribute more benefit to the industry and economy as a whole and, thus, should be entitled to more support.

Plaintiffs' arguments do not support their contention that the Act benefits only private parties. Certainly, the principal purpose of the Act is a public one: to stimulate economic activity, including the creation and maintenance of jobs and the attraction and retention of sports and entertainment, particularly betting on horse racing. See *Friends of the Parks*, 203 Ill. 2d at 316. We conclude that the Act does, in fact, serve a public purpose. The surcharge will benefit the general well-being of society and the prosperity of the people of the State of Illinois. See *Friends of the Parks*, 203 Ill. 2d at 316; see also *People ex rel. City of Urbana*, 68 Ill. 2d at 75 ("[s]timulation of commercial growth and removal of economic stagnation are *** objectives which enhance the public weal"). The emphasis of the Act is to benefit the entire horse racing industry, not simply the track owners, and the collateral businesses associated with that industry. The surcharge will serve to reduce the costs of unemployment and the evils attendant thereto should the industry collapse and the 35,000-plus associated jobs lost. See *People ex rel. City of Urbana*, 68 Ill. 2d at 74 (upholding act "whose stated object was to 'reduce conditions of unemployment and the evils attendant thereto, and to encourage the increase of industry within the State' "), quoting *McMackin*, 53 Ill. 2d at 354. The ultimate result of the surcharge will encourage an increase in industry in this state, including farming, breeding, and training, will stimulate commercial growth, and will revitalize an economically stagnant industry. All of these are objects that enhance the public "weal." *People ex rel. City of Urbana*, 68 Ill. 2d at 75. Illinois has a strong interest in preserving the viability of industries in this state, which in turn will benefit the economy of the state as a whole.

As we stated in *McMackin*:

> "We believe that conditions of unemployment within the State are well known and need no documentation. Legislation intended to alleviate these conditions and their inherent problems certainly is in the public interest. New and expanded industry in communities within the State provides work and opportunities not only for those who would be directly employed, but also for others who provide goods and services to those who live and work in the community. \*\*\* The potential impetus to economic development within our State, which otherwise might be lost to other States with financing of this type, likewise serves the public interest. The private benefit resulting from the Act is incidental to the public purpose and benefit to be served, and there is no contravention of the constitution in this regard." *McMackin*, 53 Ill. 2d at 358.

The same is true here.

Because we find that plaintiffs have not shown the legislative findings in the Act are evasive nor have they shown that the purpose of the Act is primarily to benefit private interests, we defer to the legislative findings in the Act and the legislature's determination that the Act was necessary. Accordingly, we conclude that the Act does not violate article VIII, section 1.

### III. Retroactivity

Plaintiffs raise a cursory argument regarding retroactivity. Plaintiffs argue that it is impermissible to impose the tax at issue here because it retroactively punishes them for entirely lawful competition. Citing to *Apfel*, 524 U.S. 498, 141 L. Ed. 2d 451, 118 S. Ct. 2131, plaintiffs contend the surcharge was unconstitutionally imposed as a retribution for past success which they could not possibly have known of.

In *Apfel*, a majority of the Court struck down, on varying constitutional grounds, an act that required coal mine operators to fund health-care benefits for retired workers. *Apfel*, 524 U.S. at 537, 141 L. Ed. 2d at 479, 118 S. Ct. at 2153. There, the liability reached back 30 to 50 years (*Apfel*, 524 U.S. at 531, 141 L. Ed. 2d at 475-76,

118 S. Ct. at 2150) and was a considerable financial burden on the defendant (*Apfel*, 524 U.S. at 531, 141 L. Ed. 2d at 476, 118 S. Ct. at 2150). Moreover, the liability would continue for many years in the future. *Apfel*, 524 U.S. at 531, 141 L. Ed. 2d at 476, 118 S. Ct. at 2150. Lastly, the liability was unrelated to any injury the defendant had caused. *Apfel*, 524 U.S. at 537, 141 L. Ed. 2d at 479, 118 S. Ct. at 2153.

The case at bar is distinguishable from *Apfel*. The surcharge does not reach back in the distant past and is of a very limited duration, *i.e.*, two years. Further, while the surcharge might be a temporary financial burden on plaintiffs, it is related to injury the casinos caused to the horse racing industry. We find no constitutional violation on this ground.

## IV. Equal Protection and Special Legislation

No arguments have been raised before us in connection with the equal protection and special legislation challenges and, thus, we need not address them.

## CONCLUSION

The circuit court erred in granting summary judgment in favor of plaintiffs. Public Act 94–804 does not violate the uniformity clause. Moreover, the Act is not subject to a takings analysis, does not violate the public funds clause of the state constitution, and is not impermissibly retroactive. Accordingly, we reverse the judgment of the circuit court.

*Reversed.*